## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STÉPHANE GOUET, Individually and On Behalf of All Others Similarly Situated, <br><br>      Plaintiff, <br><br>      v. <br><br> USA TECHNOLOGIES, INC., STEPHEN P. HERBERT, and PRIYANKA SINGH, <br><br>      Defendants. | Master File No. 2:19-cv-04565-JHS <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiff Pinkesh Nahar and named Plaintiffs Peter Farsaci and University of Puerto Rico Retirement System ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding USA Technologies, Inc. ("USAT" or "Company"), analysts' reports and advisories about the Company, other

litigation involving the Company, consultations with market efficiency and forensic accounting experts, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of: 1) a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased USAT common stock from August 22, 2017 through February 6, 2019, both dates inclusive ("Class Period") (the "Exchange Act Class"), seeking to recover compensable damages caused by USAT's and the Officer Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act"); and 2) a subclass consisting of all persons or entities, other than Defendants and their affiliates, who purchased USAT common stock pursuant to the Company's Registration Statement and Prospectus issued in connection with the Company's May 23, 2018 secondary public offering (the "SPO") (the "Securities Act Subclass"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act"). Plaintiff the University of Puerto Rico Retirement System asserts the Securities Act claim on behalf of the Securities Act Subclass.

2.     USAT focuses on electronic payment technology. The Company is best known for its ePort Connect cashless payment technology, which is designed to

address the needs of the self-serve retail market. ePort Connect technology can be found in food and beverage vending machines, commercial or multi-housing laundry operations, amusement and arcade machines, and various other self-service kiosks or point-of-sale terminals. USAT's ePort Connect products and services facilitate cashless payments by customers via credit, debit, or mobile payment or digital wallet services.

3.      The Company derives the majority of its revenue from its ePort Connect technology, and more specifically from ongoing license and transaction fees. The majority of the Company's ePort Connect customers pay a monthly fee plus a blended transaction rate on the transaction dollar volume processed by the Company, making connections to the ePort Connect service the most significant driver of the Company's revenue. Equipment sales and servicing account for a smaller proportion of the Company's revenue.

4.      Throughout the Class Period, Defendants USAT, Stephen P. Herbert ("Herbert"), its former Chief Executive Officer ("CEO"), and Priyanka Singh ("Singh"), its former Chief Financial Officer ("CFO") (collectively, the "Officer Defendants"), engaged in a multiyear accounting fraud by misrepresenting key financial metrics, including reporting "record" revenue and net income. Herbert "resigned" as USAT's CEO under shareholder pressure effective October 17, 2019. Singh "resigned" effective January 7, 2019.

5.     To avoid detection of their fraud, USAT and the Officer Defendants falsely reassured investors that prior material internal control weaknesses over financial reporting had been remediated. Rather than remediate those internal control weaknesses, USAT management, led by Defendants Herbert and Singh, lied to USAT's auditor, RSM US LLP ("RSM"), in order to obtain clean audit reports for USAT's financial statements.

6.     USAT's false financial statements allowed USAT to post "record" results to investors. These "record" results allowed Defendants Herbert and Singh, as well as other Company executives, to achieve valuable incentive compensation they otherwise would not have been entitled to, but for USAT's false financial statements.

7.     USAT's false financial statements also permitted USAT to sell its stock at artificially inflated prices to investors in a secondary public offering --- raising over $75 million for USAT.

8.     A series of corrective disclosures beginning on September 11, 2018 and continuing through November 14, 2019 gradually revealed the details of USAT and the Officer Defendants' fraud on the market.

9.     Among other problems, USAT, Herbert and Singh violated Generally Accepted Accounting Principles ("GAAP") and USAT's own accounting policies. For example, according to the Company's 8-K filed with the SEC on January 14,

2019: (a) "senior management did not timely or fully report certain employee complaints and concerns to the independent auditor and/or the Audit Committee"; (b) "Senior management did not timely or thoroughly investigate or effectively remediate certain employee complaints or concerns relating to compliance and/or financial reporting matters"; (c) "pressure to achieve sales targets gave rise to the premature and/or inappropriate recognition of revenues and reporting of connections associated with certain of the examined transactions, typically occurring at or near the end of financial reporting periods"; (d) "on multiple occasions, the Company's finance function was not timely or fully apprised of the salient transaction terms in order to permit them to properly evaluate the accounting treatment of a given transaction" (e) "the Company's internal controls failed and/or were not adequate to ensure that there was effective communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions[.]"

10.    As a consequence of this fraud, (a) five senior executives, including defendants Herbert and Singh, were fired, resigned, or demoted; (b) the Company's stock was delisted from trading on NASDAQ; (c) USAT's independent auditor, RSM, noisily resigned, alerting investors that it could not rely on the Company's management's representations; and (d) investors saw the market price of USAT's stock decimated by Defendants' conduct, as it lost more than half of its value.

5

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District. USAT's primary executive offices are located in this District.

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

15.     Lead Plaintiff, as set forth in his previously filed PSLRA Certification, acquired USA Technologies securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16.     Named Plaintiff the University of Puerto Rico Retirement System (the "UPR Retirement System"), as set forth in its previously filed PSLRA Certification, purchased USAT common stock on the open market during the Class Period and pursuant to the Company's materially untrue and misleading Registration Statement and Prospectus issued in connection with the Company's SPO.

17.     Named Plaintiff Peter Farsaci, as set forth in the accompanying PSLRA Certification, acquired USAT securities at artificially inflated prices during the Class Period.

18.     Each of the Plaintiffs was damaged upon the revelation of the alleged corrective disclosures.

19.     Defendant USAT provides wireless networking, cashless transactions, asset monitoring, and other value-added services in the United States and internationally. It is a Pennsylvania corporation. USAT common stock traded on NASDAQ under the symbol "USAT" until September 26, 2019.

20.     Defendant Herbert served as the Company's CEO from November 30, 2011 until October 17, 2019, when he "resigned" under pressure from an activist shareholder. The activist investor, Hudson Executive Capital LP, had proposed a new slate of directors on the grounds that the existing Board of Directors had failed to hold Herbert accountable for repeated failures and the destruction of shareholder value.

21.    Until January 13, 2019, Herbert had also served as the Company's Chairman. Throughout the Class Period, Herbert signed certifications in each of the Company's periodic financial reports pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), stating that to his knowledge, each report fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act; and the information in each report fairly presented, in all material respects, the financial condition and results of operations of the Company.

22.    Defendant Singh served as the Company's CFO from March 31, 2017 until January 7, 2019. Throughout the Class Period, Singh signed certifications in each of the Company's periodic financial reports pursuant to SOX, stating that to her knowledge, each report fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act; and the information in each report fairly presented, in all material respects, the financial condition and results of operations of the Company.

23.    Defendants Herbert and Singh are herein referred to as "Officer Defendants."

24.    Each of the Officer Defendants:

a.    directly participated in the management of the Company;

b.    was directly involved in the day-to-day operations of the Company at the highest levels;

    c.    was privy to confidential proprietary information concerning the Company and its business and operations;

    d.    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

    f.    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

    g.    approved or ratified these statements in violation of the federal securities laws; and

    h.    signed false SOX certifications.

25.    Defendant Steven D. Barnhart ("Barnhart") has been a member of USAT's Board since October 2009. He is a member of its Audit Committee.

26.    Defendant Joel Brooks ("Brooks") has been a member of USAT's Board since March 2007.

27.    Defendant Robert L. Metzger ("Metzger") has been a member of USAT's Board since March 2016. He is the chair of its Audit Committee.

28.     Defendant Albin F. Moschner ("Moschner") joined the Board in May 2012, and became its Chairman in January 2019.

29.     Defendant William J. Reilly, Jr. ("Reilly") has been a member of the Board since July 2012.

30.     Defendant William J. Schoch ("Schoch") has been a member of the Board since July 2012. He is a member of its Audit Committee.

31.     Defendants Barnhart, Brooks, Metzger, Moschner, Reilly, and Schoch are herein referred to as "Board Defendants."

32.     Each of the Board Defendants reviewed and signed the Registration Statement for the SPO.

33.     Collectively, Defendants USAT, the Officer Defendants, and the Board Defendants are herein referred to as the "USAT Defendants."

34.     Defendant William Blair & Company, L.L.C. ("William Blair") acted as sole book-running manager and underwriter for the SPO and assisted in the preparation and dissemination of USAT's SPO materials ("Offering Documents"). William Blair's headquarters are located at 150 North Riverside Plaza, Chicago, Illinois 60606.

35.     Defendant Craig-Hallum Capital Group LLC ("Craig-Hallum") acted as co-manager and underwriter for the SPO. Craig-Hallum's headquarters are located at South 9th Street, Suite 350, Minneapolis, Minnesota 55402.

36.     Defendant Northland Securities, Inc. ("Northland") acted as co-manager and underwriter for the SPO. Northland's headquarters are located at 150 South Fifth Street, Suite 3300, Minneapolis, Minnesota 55402.

37.     Defendant Barrington Research Associates, Inc. ("Barrington") acted as co-manager and underwriter for the SPO. Barrington's headquarters are located at 161 North Clark Street, Suite 2950, Chicago, Illinois 60601.

38.     Defendants William Blair, Craig-Hallum, Northland, and Barrington are herein collectively referred to as the "Underwriter Defendants."

39.     Collectively, the USAT Defendants and the Underwriter Defendants are herein referred to as "Defendants."

40.     Pursuant to the Securities Act, each Defendant is strictly liable for the false and misleading statements in the Offering Documents, subject to affirmative defenses.

41.     USAT is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with USAT.

42.     The scienter of the Officer Defendants and other employees and agents of the Company is similarly imputed to USAT under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

43.    On September 29, 2015, USAT admitted that it had material weaknesses in its internal controls over financial reporting.

44.    In a Form NT 10-K filed with the SEC on that day, the Company disclosed that its management's assessment of its disclosure controls and procedures and internal control over financial reporting identified internal control deficiencies, most significantly process over the reconcilement, analysis and management oversight of certain customer accounts receivable balances related to customer processing and service fees. The Company admitted that the procedures in place did not identify a large number of uncollectible small balance accounts receivable, explaining:

> The Company's management assessed the effectiveness of its disclosure controls and procedures and internal control over financial reporting as of June 30, 2015. Based on its assessment, management identified deficiencies in both the design and operating effectiveness of the Company's internal control over financial reporting, which when aggregated represent a material weakness in internal control. The most significant of these was the process over the reconcilement, analysis and management oversight of certain customer accounts receivable balances related to customer processing and service fees. The procedures in place did not identify a large number of small balance accounts that may be uncollectible and were not appropriately dispositioned, collected, remediated, reserved for and/or written-off. As a result, the Company changed its June 30, 2015 financial results included in its

> September 10, 2015 press release by increasing its bad
> debt reserve by approximately $450 thousand resulting in
> an after-tax charge of approximately $270 thousand
> relating to these customer accounts receivable.

45. One year later, in the Company's Form 10-K for the fiscal year ended June 30, 2016, filed with the SEC on September 13, 2016, the Company told investors that it was "committed to remediating the control deficiencies that gave rise to the material weakness."

46. Defendant Singh joined the Company effective March 31, 2017.

## Defendants Misrepresent the Company's Fourth Quarter and Fiscal Year 2017 Operating Results

47. The Class Period begins on August 22, 2017, when, prior to the opening of the stock market, USAT issued a press release announcing operating results for the fourth quarter and fiscal year ended June 30, 2017. The Company reported "record quarterly revenue of $34.3 million, a year-over-year increase of 56% marking the 31st consecutive quarter of growth." "Record net connections of 64,000" represented "a year-over-year increase of 129%." USAT also reported "[q]uarterly GAAP net income of $0.2 million, or $0.01 per share, compared to net loss of $(872,000), or $(0.02) per share for the prior year period."

48. On an annual basis, "[r]ecord total revenue" was reported "of $104.1 million, a year-over-year increase of 35%." A "[r]ecord 568,000 net connection to ePort services as of June 30, 2017, represent[ed] a year-over-year increase of 32%."

49.     In USAT's press release announcing its results, reviewed and approved by Singh and Herbert, Herbert touted the record results:

> Our fiscal fourth quarter performance capped a strong year for USA Technologies. We achieved record revenue, and added the highest number of connections to our ePort service in the company's history. We are executing well in an accelerating market and have exceeded our long-term goals of attaining $100 million in annual revenue and 500,000 connections this fiscal year.

50.     At an earnings call held the same day, Defendant Herbert further emphasized the Company's "record-breaking fourth quarter and fiscal year," explaining that in the fourth quarter of 2016 alone, USAT added more new connections than in the entire 2015 fiscal year. Herbert also told analysts that Singh had already had a "swift and positive impact" on the Company's finance function in only five months at USAT.

51.     Singh added on the earnings call that in fiscal year 2017, USAT "exceeded our long-term goals by achieving $104 million in revenue and 568,000 in connections, all while driving growth in profitability and expansion in our operating margins."

52.     The next day, on August 23, 2017, USAT filed its annual report for the fiscal year ended June 30, 2017 with the SEC ("2017 10-K"). In the 2017 10-K, Defendants USAT, Herbert, and Singh reported USAT's financial results for the

fiscal year. They also told investors that the Company had solved its previous internal control problems.

53.    The 2017 10-K stated that the Company's internal controls over financial reporting were effective as of June 30, 2017 based on criteria established in the *2013 Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission (the "COSO Framework"). USAT explained that Herbert and Singh had assessed the effectiveness of its internal control over financial reporting as of June 30, 2017 and had concluded that the Company had remedied its internal control weaknesses, stating in relevant part:

> We identified in our Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"), significant deficiencies that, when aggregated, resulted in a material weakness in our internal controls over financial reporting.
>
> In response to these weaknesses, we have designed and implemented a series of internal controls related to a number of business process areas, including:
>
> - Identification, analysis and accrual of merchant receivables at period-end
>
> - Detailed review of the accounts receivable aging, and
>
> - Search for and analysis of unrecorded liabilities prior to period close.
>
> We have successfully completed the testing and remediation necessary to conclude that the material

weakness identified in our 2016 Form 10-K has been remediated.

54.     The 2017 10-K was signed by Defendants Herbert and Singh. Herbert and Singh also signed certifications pursuant to SOX attesting that the Company's financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

55.     Herbert and Singh also attested in reciprocal certifications that they had designed "disclosure controls and procedures" and "internal control over financial reporting" required "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

      d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

57.    The 2017 10-K was materially false and misleading because Defendants USAT, Herbert, and Singh knew or recklessly disregarded that it materially misstated the Company's financial statements and failed to disclose material weaknesses in its internal controls, which Defendants later admitted.

58.    According to the Audit Committee's investigation and the additional findings reported in the Company's annual report on Form 10-K for the fiscal year ended June 30, 2019, which also included USAT's audited consolidated financial statements for the fiscal year ended June 30, 2018, which had not previously been

filed, as well as restatements of previously filed consolidated financial statements, filed on October 9, 2019 ("2019 10-K") and its amended 2019 10-K filed on November 14, 2019 ("2019 10-K/A"), the Company prematurely and/or inappropriately recognized revenue and reported connections associated with certain transactions at or near the end of financial reporting periods, accounted for transactions without being apprised of the salient transaction terms, recorded certain charges as expenses rather than reductions of reported revenues in earlier fiscal quarters, failed to ensure adequate communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions, failed to ensure that employee complaints and concerns were investigated, if needed remediated, and reported to the Company's auditor and/or the Audit Committee, failed to ensure a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP, and failed to ensure that required accounting methodologies, policies and supporting documentation were in place. Consequently, the financial statements reported in the 2017 10-K were the result of improper accounting related to revenue recognition, deferred income tax accounting, sales-tax reserves, reserves for bad debts, sales return reserves, inventory reserves, sale-leaseback accounting, balance sheet classification of debt and preferred stock, and capitalization of sales commissions.

59.     As disclosed in USAT's 2019 10-K, in the 2017 10-K, the Company overstated its assets as of June 30, 2017 by $30.1 million (or 44.6%), understated its liabilities by $8 million (or 20.1%), overstated shareholders' equity by $41.3 million (or 168.8%), overstated revenues by $2.7 million (or 2.6%), overstated gross profit by $1.6 million (or 6.3%), understated loss before income taxes by $5.6 million (or 76.1%), understated net loss by $5.6 million (or 69%), and understated loss per share by $0.14 or (or 70%).

60.     The 2017 10-K also included a report by RSM to the Board and shareholders, stating that RSM had audited the Company's financial statements and concluded that they were presented fairly, in all material respects, in conformity with GAAP. RSM also issued an opinion on USAT's internal control over financial reporting stating that in its opinion, USAT maintained, in all material respects, effective internal control over financial reporting as of June 30, 2017, based on criteria established in the COSO Framework.

61.     RSM's clean audit opinions, however, were the result of Defendants Herbert, and Singh lying to RSM in connection with its audit, and were therefore materially false and misleading. As a result on February 6, 2019, RSM withdrew its audit opinions for the 2017 10-K, informing investors that they could no longer rely on management's representations.

### The Cantaloupe Acquisition

62.     On November 7, 2017, USAT announced that it had entered into a definitive agreement to acquire Cantaloupe Systems, Inc. ("Cantaloupe"), a provider of cloud and mobile solutions for vending, micro markets, and office coffee service. The acquisition was for $65 million in cash and $19.8 million in USAT common stock. The acquisition closed on November 9, 2017.

### Defendants Misrepresent the Company's First Quarter for Fiscal Year 2018 Operating Results

63.     On November 8, 2017, prior to the opening of the U.S. securities markets, the Company issued a press release announcing its financial results for the first quarter ended September 30, 2017 for fiscal year 2018

64.     USAT reported (a) "[r]evenue of $25.6 million, a year-over-year increase of 19% marking the 32nd consecutive quarter of growth," and (b) "[n]et connections of 26,000, a year-over-year increase of 37%."

65.     In the press release announcing the results, approved by Singh and Herbert, Herbert stated that the "first quarter was a strong start to our fiscal year, marked by continued momentum of cashless acceptance in our target market."

66.     Singh added in the press release that "I am very pleased with our first quarter results. Consistent with our strategy, we grew revenue, while increasing our [License & Transaction] margins and managing expenses, which led to improved profitability."

67.     The press release also stated that "[a]s a result of the announced agreement with Cantaloupe Systems, USAT is updated its outlook for fiscal 2018 … and now expects pro-forma combined revenue to be between $137 million to $142 million and adjusted EBITDA to be between $12.5 million to $13.5 million."

68.     On the earnings conference call conducted shortly after the issuance of the press release, Singh emphasized that "[w]e are pleased to announce another stellar quarter with strong performance and growth across all key performance indicators."

69.     On November 9, 2017, the Company filed the 1Q 2018 10-Q with the SEC, providing the Company's first quarter 2018 financial results. The 1Q 2018 10-Q was signed by Defendants Herbert and Singh. Herbert and Singh also signed certifications pursuant to SOX attesting that the Company's financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

70.     Herbert and Singh also attested in reciprocal certifications that they had designed "disclosure controls and procedures" and "internal control over financial reporting" required "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure

controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting[.]

72.    The 1Q 2018 10-Q stated there were no changes in internal controls over financial reporting that occurred during the quarter ended September 30, 2017 that materially affected or were reasonably likely to materially affect the Company's internal controls over financial reporting.

73.    The 1Q 2018 10-Q was materially false and misleading because Defendants USAT, Herbert, and Singh knew or recklessly disregarded that it materially misstated the Company's financial statements and failed to disclose material weaknesses in its internal controls, which Defendants later admitted.

74.    According to the Audit Committee's investigation and the additional findings reported in the 2019 10-K and 2019 10-K/A, the Company prematurely and/or inappropriately recognized revenue and reported connections associated with certain transactions at or near the end of financial reporting periods, accounted for transactions without being apprised of the salient transaction terms, recorded certain charges as expenses rather than reductions of reported revenues in earlier fiscal quarters, failed to ensure adequate communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions, failed to ensure that employee complaints and concerns were investigated, if needed remediated, and reported to the Company's auditor and/or the Audit Committee, failed to ensure a proper tone and control awareness that focused on achieving consistent application of accounting

policies and procedures and strict adherence to GAAP, and failed to ensure that required accounting methodologies, policies and supporting documentation were in place. Consequently, the financial statements reported in the 1Q 2018 10-Q were the result of improper accounting related to revenue recognition, deferred income tax accounting, sales-tax reserves, reserves for bad debts, sales return reserves, inventory reserves, sale-leaseback accounting, balance sheet classification of debt and preferred stock, and capitalization of sales commissions.

75.     As disclosed in USAT's 2019 10-K, in the 1Q 2018 10-Q, the Company overstated its assets by $31.4 million (or 30.2%), understated liabilities by $8.9 million (or 23.5%), overstated shareholders' equity by $43.4 million (or 69.3%), overstated revenues by $358,000 (or 1.4%), overstated gross profit by $1.0 million (or 16.5%), understated loss before income taxes by $1.5 million (or 68.2%), understated net loss by $2.0 million (or 78.2%), and understated loss per share by $0.04 or (or 80%).

## Defendants Misrepresent the Company's Second Quarter for Fiscal Year 2018 Operating Results

76.     On February 8, 2018, before the market opened, the Company issued a press release announcing its second quarter financial results for the period ending December 31, 2017 for the fiscal year 2018. On an earnings call held the same day, Herbert and Singh again reported strong results and increased management's guidance for the year.

77.   In the February 8, 2018 press release, USAT reported (a) "[r]evenue of 32.5 million, which reflects the acquisition of Cantaloupe [] on November 9, 2017, increased 49% year-over-year, marking the 33rd consecutive quarter of growth," and (b) "[n]ew net connections of 311,000, which include approximately 270,000 connections related to the acquisition of Cantaloupe and bring total connections over 900,000."

78.   In the press release announcing the results, approved and reviewed by Singh and Herbert, Herbert stated that the "[w]e are very pleased with the significant progress we have made in integrating Cantaloupe into our organization."

79.   Singh added in the February 8, 2018 press release that "[t]he integration with Cantaloupe is proceeding very well."

80.   On a conference call conducted shortly after the issuance of the February 8, 2018 press release, Herbert emphasized his knowledge of the Company's operations and its fast-paced revenue growth rate:

> Second quarter revenue increased 26% on a pro forma basis from the year ago period, an increase of 49% on a historical basis, which represents an acceleration in our top line growth and marks our 33rd consecutive quarter of year-over-year revenue growth. Given our increased scale and by continuing to leverage operating expenses, we were successful in converting this revenue growth to improving our non-GAAP profitability. Our service continues to be utilized by consumers at an increasing rate including the two months of results from Cantaloupe in the second quarter, we processed nearly 145 million transactions for approximately $273 million in value.

\* \* \*

We are very pleased with the early success we've achieved in cross-selling our new cloud-based analytics software into the existing USAT customer base. During the month of December alone, we signed 20 customer agreements to add one or more of the performance optimization elements in our new analytics software into their existing ePort Connect cashless payment services.

\* \* \*

For USAT, we were able to increase our revenue per connection while bringing more value to our customers and we added approximately 3,400 connections in the process as existing customers took the opportunity to also expand our cashless locations. We expect to begin generating revenue from these contract expansions in the fiscal third quarter.

\* \* \*

We've always said that we will flex on hardware in order to acquire the long-term, sticky, recurring revenue associated with our services and the stakes for that are now much higher, because if we had four services, four core services previously, now we have eight. So the revenue opportunity associated with that hardware sale long-term is very significant, but yeah, I think what we will see is the number will fluctuate.

81.     Singh added:

Our business model features a high proportion of recurring revenue from a sticky customer base…. [O]ur strategy is to use equipment sales as an enabler for driving long-term higher margin recurring revenue by leveraging the relationship made from the initial connection…. Given the success we have seen so far with our combined offering, we are raising our revenue guidance to be between 140

26

million to 145 million and adjusted EBITDA to be between 13.5 million to 14.5 million.

82.   On February 9, 2018, after the market closed, the Company filed the 2Q 2018 10-Q with the SEC, providing the Company's first quarter 2018 financial results. The 2Q 2018 10-Q was signed by Defendants Herbert and Singh, and contained signed certifications pursuant to SOX by Defendants Herbert and Singh attesting to the accuracy of the Company's financial reporting and the disclosure of all fraud.

83.   The 2Q 2018 10-Q stated there were no changes in internal controls over financial reporting that occurred during the quarter ended December 31, 2017 that materially affected or were reasonably likely to materially affect the Company's internal controls over financial reporting.

84.   Herbert and Singh also signed certifications pursuant to SOX attesting that the Company's financial statements "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

85.    Herbert and Singh also attested in reciprocal certifications that they had designed "disclosure controls and procedures" and "internal control over financial reporting" required "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

      a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

      b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

      c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based upon such evaluation; and

      d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected or is

> reasonably likely to materially affect, the registrant's
> internal control over financial reporting[.]

87.     The 2Q 2018 10-Q was materially false and misleading because Defendants USAT, Herbert, and Singh knew or recklessly disregarded that it materially misstated the Company's financial statements and failed to disclose material weaknesses in its internal controls, which Defendants later admitted.

88.     According to the Audit Committee's investigation and the additional findings reported in the 2019 10-K and 2019 10-K/A, the Company prematurely and/or inappropriately recognized revenue and reported connections associated with certain transactions at or near the end of financial reporting periods, accounted for transactions without being apprised of the salient transaction terms, recorded certain charges as expenses rather than reductions of reported revenues in earlier fiscal quarters, failed to ensure adequate communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions, failed to ensure that employee complaints and concerns were investigated, if needed remediated, and reported to the Company's auditor and/or the Audit Committee, failed to ensure a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP, failed to correctly account for the Cantaloupe acquisition, failed to put appropriate financial reporting controls and processes in place to prevent or detect material errors in Cantaloupe's financial

statements on the date of and subsequent to the acquisition, failed to adequately or consistently perform financial integration of Cantaloupe, failed to conform certain of Cantaloupe's accounting practices to the Company's accounting policies and to GAAP, and failed to ensure that required accounting methodologies, policies and supporting documentation were in place. Consequently, the financial statements reported in the 2Q 2018 10-Q were the result of improper accounting related to revenue recognition, deferred income tax accounting, sales-tax reserves, reserves for bad debts, sales return reserves, inventory reserves, sale-leaseback accounting, balance sheet classification of debt and preferred stock, and capitalization of sales commissions.

89.    As disclosed in USAT's 2019 10-K, in the 2Q 2018 10-Q, the Company overstated its assets by $17.7 million (or 10.6%), understated liabilities by $11.0 million (or 13.5%), overstated shareholders' equity by $31.8 million (or 38.7%), overstated quarterly revenues by $974,000 (or 3.1%), understated quarterly loss before income taxes by $908,000 (or 20.9%), overstated quarterly net loss by $8.3 million (or 198.4%), and overstated quarterly loss per share by $0.16 or (or 200%).

**Defendants Misrepresent the Company's Third Quarter for Fiscal Year 2018 Operating Results**

90.    On May 8, 2018, before the market opened, the Company issued a press release announcing its third quarter financial results for the period ending March 31, 2018 for the fiscal year 2018

91.    USAT reported (a) "[r]evenue of 35.8 million, increased 35% year-over-year, marking the 34th consecutive quarter of growth," and (b) "[n]ew net connections of 64,000."

92.    In the May 8, 2018 press release, reviewed and approved by Singh and Herbert, Herbert told investors: "Our third fiscal quarter results demonstrate the successful integration of Cantaloupe, including additional cross-selling wins, improved operational efficiencies, as well as revenue and margin expansion across our business."

93.    On an earnings conference call convened shortly after the issuance of May 8, 2018 press release, both Herbert and Singh portrayed themselves as hands-on senior executives, intimately familiar with USAT's operations.

94.    Herbert emphasized on the call that "during the third quarter, we exceeded all of the long-term revenue margin targets that we put in place less than six months ago." The Company's Audit Committee later determined that pressure to achieve these same targets resulted in accounting fraud.

95.    Singh added that the:

> [S]trength and consistency of our business model is evident in our third quarter results…. We also generated an almost 500 basis point expansion in our adjusted EBITDA margin as we benefited from significant operating leverage due to our growing scale…. Our long-term customer contracts and diversified offerings provides us with a highly visible and high margin recurring revenue streams…. In addition, we continue to experience quarter-

> over-quarter variability in equipment revenue, depending
> on the mix of services sold in a given quarter.… The sales
> team has done a fantastic job with the cross-sells and we
> expect to see the benefit of that in the future quarters.

96.     On May 10, 2018, after the market closed, the Company filed the 3Q

2018 10-Q with the SEC, providing the Company's third quarter 2018 financial

results, including its revenues, and position. The 3Q 2018 10-Q was signed by

Defendants Herbert and Singh, and contained signed certifications pursuant to SOX

by Defendants Herbert and Singh attesting to the accuracy of the Company's

financial reporting and the disclosure of all fraud.

97.     The 3Q 2018 10-Q stated there were no changes in internal controls

over financial reporting that occurred during the quarter ended March 31, 2018 that

materially affected or were reasonably likely to materially affect the Company's

internal controls over financial reporting.

98.     The 3Q 2018 10-Q was materially false and misleading because

Defendants USAT, Herbert, and Singh knew or recklessly disregarded that it

materially misstated the Company's financial statements and failed to disclose

material weaknesses in its internal controls, which Defendants later admitted.

99.     According to the Audit Committee's investigation and the additional

findings reported in the 2019 10-K and 2019 10-K/A, the Company prematurely

and/or inappropriately recognized revenue and reported connections associated with

certain transactions at or near the end of financial reporting periods, accounted for

transactions without being apprised of the salient transaction terms, recorded certain charges as expenses rather than reductions of reported revenues in earlier fiscal quarters, failed to ensure adequate communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions, failed to ensure that employee complaints and concerns were investigated, if needed remediated, and reported to the Company's auditor and/or the Audit Committee, failed to ensure a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP, failed to correctly account for the Cantaloupe acquisition, failed to put appropriate financial reporting controls and processes in place to prevent or detect material errors in Cantaloupe's financial statements on the date of and subsequent to the acquisition, failed to adequately or consistently perform financial integration of Cantaloupe, failed to conform certain of Cantaloupe's accounting practices to the Company's accounting policies and to GAAP, and failed to ensure that required accounting methodologies, policies and supporting documentation were in place. Consequently, the financial statements reported in the 2Q 2018 10-Q were the result of improper accounting related to revenue recognition, deferred income tax accounting, sales-tax reserves, reserves for bad debts, sales return reserves, inventory reserves, sale-leaseback accounting,

balance sheet classification of debt and preferred stock, and capitalization of sales commissions.

100.   As disclosed in the Company's 2019 10-K, in the 3Q 2018 10-Q, USAT overstated its assets by $22.7 million (or 13.4%), understated liabilities by $10.6 million (or 12.4%), overstated shareholders' equity by $36.4 million (or 45.9%), overstated quarterly revenues by $2.2 million (or 6.7%), overstated quarterly gross profit by $2.1 million (or 21.3%), understated quarterly loss before income taxes by $2.2 million (or 69.5%), overstated quarterly net income by $4.4 million (turning a $3.6 million loss into $826,000 income), and overstated quarterly income per share by $0.09 (turning a $0.07 loss into $0.02 income).

**Defendants Misstate Facts In the Offering Documents For the SPO**

101.   On May 9, 2018, USAT filed a Registration Statement on Form S-1 with the SEC ("Registration Statement").

102.   On May 22, 2018, USAT's Registration Statement, Amendment No. 1, was declared effective by the SEC.

103.   On May 23, 2018, USAT filed the Prospectus pursuant to Rule 424(b)(4).

104.   The SPO was priced at $11 per share, with 5,432,583 shares of USAT common stock to be sold by the Company and 553,187 shares of USAT common stock to be sold by certain selling shareholders. In addition, USAT granted the

underwriters an option to purchase up to 897,866 additional shares from the Company.

105.   On May 25, 2018, USAT issued a press release announcing the closing of its SPO, which generated gross proceeds of $75.7 million. USAT sold 6,330,449 shares of its common stock in the SPO, reflecting the full exercise of the underwriters' option to purchase additional shares. Underwriters sold an additional 553,187 shares of USAT common stock on behalf of selling shareholders.

106.   The Offering Documents for USAT's SPO were materially false. The Prospectus incorporated by reference the Company's 2017 10-K, 1Q 2018 10-Q, 2Q 2018 10-Q, and 3Q 2018 10-Q, which were materially false due to the Company's failure to record the Cantaloupe acquisition in accordance with GAAP, appropriately classify its preferred stock on the Company's balance sheet, and to recognize revenue and expenses in accordance with GAAP and its own policies.

107.   The Company itself subsequently recognized that these financial statements were materially misleading, admitting to investors that seven quarters of financial reports (including the 2017 10-K, Q1 2018 10-Q, Q2 2018 10-Q, and Q3 2018 10-Q) could no longer be relied on and would have to be restated.

108.   This action was brought within one year of the discovery of the untruthfulness of the statements and omissions and within three years of the SPO.

**The Truth Begins to Emerge and Materialize Through Partial Disclosures**

109.   On September 11, 2018, before the market opened, USA Technologies disclosed that it was unable to timely file its 2018 10-K with the SEC for the fiscal year ended June 30, 2018 as the Audit Committee of the Board was "conducting an internal investigation of current and prior period matters relating to certain of the Company's contractual arrangements, including the accounting treatment, financial reporting and internal controls related to such arrangements."

110.   On this news, USAT's stock declined 39.9% from a $15.30 closing price on September 10, 2018 to a $9.20 closing price on September 11, 2018. Trading volume was approximately 6.5 million shares, or approximately six times normal trading volume.

111.   As the internal investigation proceeded without any news or conclusion, market analysts and investors lost confidence in USAT.

112.   On September 28, 2018, *Bloomberg News* reported that "[i]nterest in news about [USAT] was unusually high…. Reader interest was at the highest level compared with the 30-day average based on Bloomberg measurements of the number of times people call up news stories or search for articles on a specific company. News flow gauges the amount of stories being published on a company relative to the previous 45 days. [USAT] shares fell 10 percent, compared with the

0.2 percent decline in the S&P 500 Index. Trading volume was 61 percent more than the 20-day average…. The stock is down 22 percent in the past week."

113.  On October 1, 2019, prior to the opening of trading, USAT issued a press release stating that the "[internal] investigation [being conducted by the Audit Committee] remains ongoing and, as such, the Company was not in a position to file the Annual Report within the 15 calendar day extension provided by the 12b-25 filing."

114.  Also on October 1, 2019, Theflyonthewall.com, an investment newsletter, reported that Barrington Research analyst Gary Prestopino had "temporarily suspended his investment rating on [USAT] citing the continuing delay in issuing its fiscal 2018 annual report 'coupled with a lack of ability to provide any transparency into the issues revolving around its inability to issue' the report."

115.  The *Philadelphia Business Journal ("Journal")* also reported on October 5, 2018 that USAT "continued to lose ground in the weeks that followed [September 11, 2018], with the stock falling by 54 percent since the day before the announcement." The *Journal* concluded that "Investors are not generally fans of uncertainty." According to the *Journal*, Keith Noonan of *Motley Fool* had noted that "it's possible that sales and earnings for the year and other periods could see substantial downward revisions, and that the company could face regulatory penalties and legal action."

116.   The newsletter *Stocks Under $10*, published by TheStreet.com, reported on November 6, 2018, that "the overhang that is the ongoing internal investigation and the failure to report its financials in a timely manner that has it noncompliant with Nasdaq [listing rules] remains…. No matter how much we may want to own USAT shares as a way to profit from the growing adoption of mobile payments, despite the tempting fall in the share price, the time isn't right as yet to add them back to the active portfolio."

117.   On November 9, 2018, at 2.07 p.m., *Bloomberg News* reported that USAT was lower for the sixth consecutive day, and "was on track for the longest losing streak since the period ended Oct. 1, 2015." *Bloomberg News* reported that USAT had "lost a total of 12 percent during the streak while the Russell 2000 Technology Index fell 1.3 percent.

118.   USAT's losing streak continued for a seventh consecutive day on November 12, 2018, falling an additional $0.20 per share to close at $5.22 per share.

119.   On November 13, 2018, after the market closed, USAT filed a notification of inability to file Form 10-Q with the SEC on Form NT 10-Q, explaining that due to the previously disclosed investigation, it would not timely file its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018.

120.   On November 13, 2018, USAT shares declined another 9.7%, or $0.51 per share, to close at $4.71 per share on 1.5 million shares traded.

121. In short, between September 12, 2018 and November 13, 2018 USAT's stock price fell 53.6%, from $10.15 per share on September 12, 2018 to $4.71 per share on November 13, 2018.

122. On January 11, 2019, after the market closed, USAT announced that Singh had "resigned" as the Company's CFO, effective January 7, 2019. Upon information and belief, Singh was forced to resign as a result of the accounting fraud.

123. On January 14, 2019, before the market opened, USAT filed a Form 8-K reporting certain findings of the Audit Committee's investigation. The Company reported that the Audit Committee had substantially completed its investigation, which focused principally on certain customer transactions entered into by the Company during fiscal years 2017 and 2018. The Audit Committee found that, for certain of those transactions, the Company had prematurely recognized revenue and, in some cases, the reported number of connections associated with the transactions was under review.

124. USAT stated that the Audit Committee and its advisors proposed adjustments to previously reported revenues principally related to the fiscal quarters occurring during the 2017 and 2018 fiscal years, with an aggregate expected reduction to previously reported revenues of up to $5.5 million. The Company stated:

> In most cases, revenues that had been recognized prematurely were, or are expected to be, recognized in

> subsequent quarters, including quarters subsequent to the
> quarters impacted by the investigative findings. The
> investigation further found that certain items that had been
> recorded as expenses, such as the payment of marketing or
> servicing fees, were more appropriately treated as contra-
> revenue items in earlier fiscal quarters.

USAT warned, however, that it had not completed its analysis of the specific

adjustments to previously reported revenues identified by the investigation, and such

analysis could result in further adjustments that could be material.

125.    USAT admitted that its corporate culture, which Herbert and Singh led,

effectively encouraged fraudulent recognition of revenue. USAT described the Audit

Committee's findings as a result of its investigation as follows:

> The principal findings of the Audit Committee were that:
> (i) pressure to achieve sales targets gave rise to the
> premature and/or inappropriate recognition of revenues
> and reporting of connections associated with certain of the
> examined transactions, typically occurring at or near the
> end of financial reporting periods; (ii) on multiple
> occasions, the Company's finance function was not timely
> or fully apprised of the salient transaction terms in order
> to permit them to properly evaluate the accounting
> treatment of a given transaction; (iii) the Company's
> internal controls failed and/or were not adequate to ensure
> that there was effective communication between the sales
> and finance functions of the Company so as to allow
> proper and timely evaluation of the accounting treatment
> of the examined transactions; (iv) senior management did
> not timely or fully report certain employee complaints and
> concerns to the independent auditor and/or the Audit
> Committee; (v) senior management did not timely or
> thoroughly investigate or effectively remediate certain
> employee complaints or concerns relating to compliance
> and/or financial reporting matters; and (vi) the foregoing

matters gave rise to substantial tonal concerns warranting remediation.

126.   In other words, the Audit Committee had discovered that the Company's sales and/or finance employees had intentionally committed misconduct, misrepresenting transactions and improperly recognized revenue, and that its senior management had ignored employee concerns and complaints. Herbert and Singh, of course, were the most senior members of the Company's management.

127.   The January 14, 2019 Form 8-K reported that the Audit Committee had recommended and the Board of Directors decided to implement a list of remedial measures: enhancing the Company's internal controls, particularly those relating to unusual or quarter end customer transactions and communication between the sales and finance departments, mandatory training for the sales department, claw-back of any appropriate compensation under the Company's incentive compensation plans, expanding the Company's public disclosure regarding connections, Company-wide training about compliance matters, including with respect to employee complaints and concerns and enhancement of the customer contracting process, considering appropriate employment actions relating to certain employees, enhancing the internal compliance and legal functions, and authorizing management to retain the appropriate individual or individuals, and splitting of the roles of Chairman and CEO.

128.   The Board removed Herbert from his role as Chairman and appointed Albin Moschner, a Company director since 2012, as the new Chairman. It also created new Chief Operating Officer and Chief Compliance Officer positions. The Board additionally directed the Nominating and Corporate Governance Committee to identify two additional independent directors to join the Board, and authorized the formation of a new Compliance Committee, to be made up of independent directors, assume oversight responsibility for the Company's compliance functions and supervise the new Chief Compliance Officer.

129.   In the January 14, 2019 Form 8-K, the Company also announced the removal or demotion of three additional senior executives. USAT disclosed that its Chief Services Officer, Michael Lawlor ("Lawlor") (the executive in charge of overseeing the growth and penetration of ePort connections), was no longer a Company employee, and was instead expected to "provide consulting services to the Company for a term and compensation to be agreed upon." USAT's Senior Vice President of Marketing and Strategic Development, Maeve Duska ("Duska"), and its Senior Vice President of Operations, George Harrum ("Harrum"), were each reassigned to new roles that would report to the to-be appointed Chief Operating Officer.

130.   Prior to their departures and demotions, the Company's former senior executives profited from its fraud. In the 2019 10-K, USAT admitted that the

Compensation Committee of the Board had determined that based upon the Company's restated financial results, the awards paid or issued to its executive officers under USAT's incentive compensation bonus plans for the 2017 fiscal year were in excess of what they would have been under the restated results. According to USAT's proxy statement filed on Schedule 14A with the SEC on April 2, 2018, for the 2017 fiscal year, approximately 65% of Herbert's and 68% of Singh's total target compensation was based on performance. Ultimately, Herbert's compensation for fiscal year 2017 totaled $1,305,686 and Singh's totaled $380,324.

131.   The January 14, 2019 Form 8-K additionally stated that while the Audit Committee had substantially completed its investigation, more time would be required for it to finalize its 2018 10-K and to determine whether the restatement of previously filed financial statements would be required.

132.   On February 6, 2019, after the market closed, Defendants' credibility eroded even further. In an 8-K, USAT revealed that its auditor RSM: could no longer rely on USAT's management's representations; had withdrawn its audit opinion and interim reviews of USAT's financial statements and internal controls; that such audit opinion and reviews should no longer be relied upon; and that RSM had resigned:

> [O]n February 1, 2019, RSM notified the Company that, based on the totality of the information, it had concluded in its professional judgment that it can no longer rely on management representations in connection with the audit of the Company's 2017 internal control over financial reporting and consolidated financial statements. As such,

RSM has recalled its previously issued audit report dated August 22, 2017 on the Company's internal control over financial reporting and consolidated financial statements for the fiscal year ended June 30, 2017, and revoked its consents to incorporate such report by reference in any and all registration statements. RSM also indicated that reliance should not be placed on: (i) the Report of Independent Public Accounting Firm dated August 22, 2017 relating to the Company's internal control over financial reporting and consolidated financial statements for the year ended June 30, 2017, and (ii) the completed interim reviews for the periods ended March 31, 2018.

133.   RSM's statement it "can no longer rely on management representations in connection with the audit of the Company's 2017 internal control over financial reporting and consolidated financial statements" refers to representations, both oral and written, that Herbert and Singh as CEO and CFO, respectively made to RSM during the audit process.

134.   In other words, USAT's senior management lied to RSM in an ongoing attempt to avoid reporting accurate financial statements to investors.

135.   In the February 6, 2019 8-K, USAT also revealed that that the Company had determined that it would restate the financial statements contained in the 2017 10-K, the 1Q 2018 10-Q, the 2Q 2018 10-Q, and the 3Q 2018 10-Q. The Company also stated that related press releases, earnings releases, management's report on the effectiveness of internal control over financial reporting as of June 30, 2017, and investor communications describing the Company's financial statements for these periods should no longer be relied upon.

136.   On this news, USAT's shares dropped by 50.58%, falling from a $6.88 closing price on February 6, 2019 to close at $3.40 per share on February 7, 2019. Trading value was 16.5 million shares, approximately 20 times normal trading value.

137.   On September 4, 2019, USAT disclosed in a Form 8-K that its new auditor had discovered additional accounting issues, which had not been revealed by the Audit Committee's investigation. As a result, on August 30, 2019, it had asked the NASDAQ Hearings Panel to grant it the maximum possible exception period permitted under applicable NASDAQ rules and interpretations, or until September 23, 2019, to regain compliance with its periodic filing requirements.

138.   On September 20, 2019, during trading hours, USAT filed a Form 8-K disclosing that it was unlikely to meet the NASDAQ Hearings Panel's September 23, 2019 deadline to regain compliance with its periodic filing obligations. As a result, USAT told investors, the NASDAQ Hearings Panel had told the Company that it would issue a delisting determination and the Company's securities would be suspended from trading on NASDAQ.

139.   Finally, on October 9, 2019, USAT filed its 2019 10-K, in which the Company reiterated the Audit Committee investigation findings and also revealed additional significant financial reporting issues and material weaknesses in the Company's internal control over financial reporting. These problems resulted in "material adjustments" to the Company's financial statements as follows:

**Non-Investigatory Adjustments Resulting From Financial Reporting Issues Identified During the Audit Process**

During the audit process, significant financial reporting issues were identified by current management, including our new interim Chief Financial Officer (the "CFO"), and our new independent auditor, which were unrelated to the internal investigation and which resulted in further adjustments to the Company's previously issued or prior fiscal years' unissued financial statements. These issues were primarily due to the lack of supporting documentation for various historical accounting reserves and policies, failure to adequately and consistently complete the financial integration of Cantaloupe, and the inadequate performance of our internal controls during the 2019 fiscal year.

Based upon these non-investigatory adjustments, on October 7, 2019, the Board of Directors of the Company, upon the recommendation of the Audit Committee, determined that the following financial statements previously issued by the Company should no longer be relied upon: (1) the audited consolidated financial statements for the fiscal year ended June 30, 2015; (2) the audited consolidated financial statements for the fiscal year ended June 30, 2016; and (3) the quarterly and year-to-date unaudited consolidated financial statements for September 30, 2016, December 31, 2016, and March 31, 2017.

The non-investigatory adjustments relate to revenue recognition, deferred income tax accounting, sales tax reserves, reserves for bad debts, inventory reserves, sale-leaseback accounting, balance sheet classification of preferred stock, and various other matters.

\* \* \*

In addition to the Audit Committee investigation matter described above, the Company also corrected for (i) out of period adjustments and errors related to the Company's acquisition and financial integration of Cantaloupe and (ii) out of period adjustments and errors identified during management's review of significant accounts and transactions.

The acquisition and financial integration-related adjustments referred to in (i) above were made in the restatement and relate to errors in the purchase accounting for our acquisition of Cantaloupe and errors in periods subsequent to the acquisition resulting from an ineffective integration of the financial systems and processes of the acquired entity with those of the Company.

The significant account and transaction review adjustments referred to in (ii) above were made in the restatement and relate to revenue recognition, deferred income tax accounting, sales-tax reserves, reserves for bad debts, inventory reserves, sale-leaseback accounting, balance sheet classification of preferred stock, and various other matters.

* * *

**Material Weaknesses Identified and Remedial Measures Implemented as a Result of Non-Investigatory Issues Identified During the Audit Process.**

During the audit process, and subsequent to June 30, 2019, financial reporting and accounting policy issues were identified by current management, including our new interim CFO, and our new independent auditor, that were unrelated to the internal investigation. These issues resulted in material adjustments to our fiscal year 2015 through 2019 financial statements, including the restatement of the fiscal year 2015 and 2016 selected financial data contained in Item 6 of this Form 10-K, and

the quarterly and year-to-date unaudited financial statements for September 30, 2016, December 31, 2016, and March 31, 2017 which are contained in Note 20, "Unaudited Quarterly Data", of the Notes to our Consolidated Financial Statements, located in Item 8 of this Form 10-K.

We have identified the following material weaknesses in connection with the non-investigatory issues:

*RISK ASSESSMENT, CONTROL ENVIRONMENT, AND MONITORING*

    A.    Management did not effectively design controls in response to the risks of material misstatement and specifically did not have an adequate process or appropriate business combination controls in place to prevent or detect material errors in the financial statements of Cantaloupe, our subsidiary acquired on November 9, 2017. There was not a full nor effective financial integration of Cantaloupe resulting in significant adjustments as follows:

- Certain trade and finance receivables relating to customer leasing/rental contracts of Cantaloupe were double counted by the Company on the opening balance sheet, and the Company's sales-type lease accounting policy was not consistently or accurately applied by the Company to these contracts subsequent to the date of the acquisition.

- In several cases, current management reversed previously recorded revenue associated with certain incorrect customer transactions and recorded

accruals for potential uncollectible amounts due from customers.

- Management has now determined the correct original amount of finance receivables and the proper balance for this and the other assets and liabilities acquired by the Company in its acquisition of Cantaloupe.

- Cantaloupe's goodwill had been incorrectly calculated using the Company's weighted average stock price for the period leading up to the closing of the transaction. Current management has determined that the stock should have been valued on the November 9, 2017 opening balance sheet using the sale price on the date of closing resulting in an increase of approximately $3.5 million to goodwill and equity.

We have concluded that we did not have appropriate financial reporting controls and processes in place to prevent or detect material errors in the financial statements of Cantaloupe on and subsequent to the acquisition, the financial integration of Cantaloupe was not adequately or consistently performed, and certain accounting practices were not implemented in order to conform to the Company's existing accounting policies and generally accepted accounting principles in the United States.

We continue to strengthen our internal controls with respect to Cantaloupe, and continue to refine our processes, procedures and documentation pertaining to our approach to the on-going accounting for Cantaloupe.

*CONTROL ENVIRONMENT AND CONTROL ACTIVITIES*

B.   Management did not maintain an effective control environment including ensuring that required accounting methodologies, policies and supporting documentation were in place. This control deficiency led to a series of financial adjustments recently identified by both current management and the Company's independent auditor related to fiscal years 2019, 2018 and 2017 and resulted in the requirement to restate previously issued financial statements.

- The Company recorded an accrual for the payment of sales taxes in certain states for certain products which affected fiscal years 2016 through 2019 due to the failure to historically account for these matters.

- The Company has determined to fully restore its income tax valuation allowance which resulted in a charge to the income statement and a corresponding reduction to retained earnings in fiscal year 2016 due to the lack of supporting evidence for its accounting position.

- The Company has determined that the original accounting treatment of a 2014 fiscal year sale-leaseback transaction as an operating lease was incorrect, and should have been treated as a capital lease, and appropriate adjustments have been recorded during fiscal years 2015 through 2019.

- Due to incorrect historical accounting treatment, the Company wrote off the

outstanding inventory on the balance sheet relating to obsolete inventory during the 2015 through 2019 fiscal years which was returned to the Company by customers in exchange for new equipment as the Company did not have a history of collecting these items and the equipment was obsolete.

- The Company had to revise its excess and obsolete inventory reserve analysis to conform with generally accepted accounting principles in the United States as the Company lacked supporting evidence for its historical reserve analysis.

- The Company has reversed certain costs which were previously incorrectly capitalized and has now appropriately reclassified debt and preferred stock.

C. Management did not perform all internal controls in a timely manner throughout the 2019 fiscal year.

Although key financial closing controls were performed, documented, and tested from April 1 through June 30, 2019, not all of the Company's internal controls were performed adequately or consistently during the year. Management has concluded that the foregoing was attributable to several factors including the lack of finance leadership during this interim period, not retaining the Company's third-party professional SOX testing consultant during this interim period, and significant management turnover.

140.   The 2019 10-K also reiterated the circumstances of accounting fraud that led to the restatement:

> Based on the principal findings of the investigation conducted by the Audit Committee, management has concluded that it did not maintain an appropriate control environment, inclusive of structure and responsibility, and risk assessment and monitoring activities which led to revenue recognition, tonal concerns, and communication issues and which constituted the following material weaknesses:
>
> A.     Pressure to achieve sales targets gave rise to the premature and/or inappropriate recognition of revenues and reporting of connections associated with certain of the examined transactions, typically occurring at or near the end of financial reporting periods;
>
> B.     On multiple occasions, the Company's finance function was not timely or fully apprised of the salient transaction terms in order to permit them to properly evaluate the accounting treatment of a given transaction;
>
> C.     The Company's internal controls failed and/or were not adequate to ensure that there was effective communication between the sales and finance functions of the Company so as to allow proper and timely evaluation of the accounting treatment of the examined transactions;
>
> D.     Senior management did not timely or fully report certain employee complaints and concerns to the independent auditor and/or the Audit Committee; and
>
> E.     Senior management did not timely or thoroughly investigate or effectively remediate certain employee complaints or concerns relating to compliance and/or financial reporting matters.

141.   In its report on internal control over financial reporting included in the
2019 10-K, USAT's new auditor, BDO USA, LLP ("BDO") detailed the poor state
of the Company's internal controls:

> In our opinion, the Company did not maintain, in all
> material respects, effective internal control over financial
> reporting as of June 30, 2019, based on the COSO criteria.
>
> * * *
>
> Several material weaknesses regarding management's
> failure to design and maintain controls have been
> identified and described in management's assessment. The
> material weaknesses related to 1) the control environment,
> a) not maintaining an appropriate control environment,
> inclusive of structure and responsibility, and risk
> assessment and monitoring activities by appropriate
> qualified resources with the knowledge, experience and
> training important to the Company's financial reporting to
> ensure compliance with generally accepted accounting
> principles requirements, b) inadequate mechanisms and
> oversight to ensure accountability for the performance of
> controls, 2) risk assessment, as the Company did not have
> an adequate assessment of changes in risks that could
> significantly impact internal control over financial
> reporting and did not effectively design controls in
> response to the risks of material misstatement; 3) control
> activities and information and communication,
> specifically between the accounting department and other
> operating departments necessary to support the proper
> functioning of internal controls; and 4) monitoring
> controls, as the Company did not effectively evaluate
> whether the components of internal control were present
> and functioning. The control environment material
> weaknesses contributed to additional material weaknesses
> in the control activities as the Company did not design and
> maintain effective controls over a) accounting close and
> financial reporting, including financial reporting controls
> at the Cantaloupe Systems, Inc. subsidiary; b) accounting

for non-routine, unusual or significant transactions, including business combinations; c) accounting for income taxes and sales tax assessments in accordance with generally accepted accounting principles; d) accounting for certain leasing transactions in accordance with generally accepted accounting principles; e) accounting for slow-moving, obsolete or damaged inventory and f) accounting for revenue arrangements. The risk assessment material weakness contributed to an additional material weakness as the Company did not design effective controls over certain business processes, including controls over the preparation, analysis, and review of closing adjustments required to assess the appropriateness of certain account balances at period end.

142. The combined effect of (1) the misstatements uncovered during the Audit Committee investigation, (2) the misstatements related to the Cantaloupe acquisition and financial integration, and (3) the additional misstatements related to significant financial reporting issues and material weaknesses in the Company's internal control over financial reporting on USAT's previously issued financial statements is summarized below based on the information disclosed in the 2019 10-K:

| ($ in thousands, except per share data) | Fiscal Year Ended 6/30/2017 | Three Months Ended | | | Total FY 2017 - 3Q 2018 |
|---|---|---|---|---|---|
| | | 9/30/2017 (1Q 2018) | 12/31/2017 (2Q 2018) | 3/31/2018 (3Q 2018) | |
| **Total Revenue** | | | | | |
| As prev. rptd. | $ 104,093 | $ 25,617 | $ 32,506 | $ 35,832 | $198,048 |
| As Restated | $ 101,436 | $ 25,259 | $ 31,532 | $ 33,592 | $191,819 |
| Misstated $ | $ (2,657) | $ (358) | $ (974) | $ (2,240) | $ (6,229) |
| Misstated % | -2.6% | -1.4% | -3.1% | -6.7% | -3.2% |
| | | | | | |
| **Gross Profit** | | | | | |
| As prev. rptd. | $ 26,646 | $ 7,201 | $ 9,201 | $ 11,944 | $ 54,992 |
| As Restated | $ 25,061 | $ 6,181 | $ 9,172 | $ 9,845 | $ 50,259 |
| Misstated $ | $ (1,585) | $ (1,020) | $ (29) | $ (2,099) | $ (4,733) |
| Misstated % | -6.3% | -16.5% | -0.3% | -21.3% | -9.4% |
| | | | | | |
| **Loss before income taxes** | | | | | |
| As prev. rptd. | $ (1,765) | $ (681) | $ (3,443) | $ (978) | $ (6,867) |
| As Restated | $ (7,370) | $ (2,143) | $ (4,351) | $ (3,203) | $ (17,067) |
| Misstated $ | $ (5,605) | $ (1,462) | $ (908) | $ (2,225) | $ (10,200) |
| Misstated % | 76.1% | 68.2% | 20.9% | 69.5% | 59.8% |
| | | | | | |
| **Net income (loss) applicable to common shares** | | | | | |
| As prev. rptd. | $ (2,520) | $ (547) | $ (12,516) | $ 826 | $ (14,757) |
| As Restated | $ (8,133) | $ (2,505) | $ (4,194) | $ (3,557) | $ (18,389) |
| Misstated $ | $ (5,613) | $ (1,958) | $ 8,322 | $ (4,383) | $ (3,632) |
| Misstated % | 69.0% | 78.2% | -198.4% | NM | 19.8% |
| | | | | | |
| **Net income (loss) per common share** | | | | | |
| As prev. rptd. | $ (0.06) | $ (0.01) | $ (0.24) | $ 0.02 | |
| As Restated | $ (0.20) | $ (0.05) | $ (0.08) | $ (0.07) | |
| Misstated $ | $ (0.14) | $ (0.04) | $ 0.16 | $ (0.09) | |
| Misstated % | 70.0% | 80.0% | -200.0% | NM | |
| | | | | | |
| NM - not meaningful | | | | | |

| ($ in thousands, except per share data) | As of Ended 6/30/2017 | As of 9/30/2017 (1Q 2018) | As of 12/31/2017 (2Q 2018) | As of 3/31/2018 (3Q 2018) |
|---|---|---|---|---|
| **Total assets** | | | | |
| As prev. rptd. | $ 97,691 | $135,219 | $ 184,651 | $191,393 |
| As Restated | $ 67,544 | $103,860 | $ 166,934 | $168,728 |
| Misstated $ | $ (30,147) | $ (31,359) | $ (17,717) | $ (22,665) |
| Misstated % | -44.6% | -30.2% | -10.6% | -13.4% |
| | | | | |
| **Total liabilities** | | | | |
| As prev. rptd. | $ 31,913 | $ 29,123 | $ 70,481 | $ 75,482 |
| As Restated | $ 39,938 | $ 38,061 | $ 81,475 | $ 86,120 |
| Misstated $ | $ 8,025 | $ 8,938 | $ 10,994 | $ 10,638 |
| Misstated % | 20.1% | 23.5% | 13.5% | 12.4% |
| | | | | |
| **Total shareholders' equity** | | | | |
| As prev. rptd. | $ 65,778 | $106,096 | $ 114,170 | $115,911 |
| As Restated | $ 24,468 | $ 62,661 | $ 82,321 | $ 79,470 |
| Misstated $ | $ (41,310) | $ (43,435) | $ (31,849) | $ (36,441) |
| Misstated % | -168.8% | -69.3% | -38.7% | -45.9% |

143. The 2019 10-K also emphasized the tremendous financial burden that the Audit Committee's investigation of Defendants' fraud had placed on the Company:

> Specifically, during the fiscal year ended June 30, 2019, the Company incurred various expenses including those relating to the internal investigation in the amount of $13.5 million, relating to the restatement in the amount of $1.9 million, and relating to pending class action litigation in the amount of $0.5 million.

144. On November 14, 2019, USAT filed an amendment number 1 to its 2019 10-K (2019 10-K/A), in which the Company revised its disclosures related to the circumstances that had resulted in restatement of the Company's previously issued financial statements dating back to fiscal year 2015, finally explaining:

On January 14, 2019, the Company reported that the Audit Committee's internal investigation relating to accounting and reporting matters was substantially completed, the principal findings of the internal investigation, and the remedial actions to be implemented by the Company as a result of the internal investigation. The Audit Committee found that, for certain of the customer transactions under review, the Company had prematurely recognized revenue. The Audit Committee proposed certain adjustments to previously reported revenues related to fiscal quarters occurring during the 2017 and 2018 fiscal years of the Company. In most cases, revenues that had been recognized prematurely were, or were expected to be, recognized in subsequent quarters, including quarters subsequent to the quarters impacted by the investigative findings. The investigation further found that certain items that had been recorded as expenses, such as the payment of marketing or servicing fees, were more appropriately treated as contra-revenue items in earlier fiscal quarters.

On February 4, 2019, the Board of Directors of the Company, upon the recommendation of the Audit Committee, and based upon the adjustments to previously reported revenues proposed by the Audit Committee, determined that the following financial statements previously issued by the Company should no longer be relied upon: (1) the audited consolidated financial statements for the fiscal year ended June 30, 2017; and (2) the quarterly and year-to-date unaudited consolidated financial statements for September 30, 2017, December 31, 2017, and March 31, 2018.

During the course of the restatement process and related reaudit of prior period financial statements, management performed a review of certain historical significant accounting policies, significant transactions, and the methodologies and assumptions underlying significant reserves. As a result, in addition to the adjustments resulting from the Audit Committee investigation described above, the Company also corrected for (i) out of

period adjustments and errors related to the Company's acquisition and financial integration of Cantaloupe and (ii) out of period adjustments and errors identified during management's review of significant accounts and transactions that are not related to the Company's acquisition and financial integration of Cantaloupe.

The acquisition and financial integration-related adjustments referred to in (i) above were reflected in the restatement of the financial statements for the fiscal quarters and year-to-date ended December 31, 2017 and March 31, 2018 contained in Note 20 hereof, and relate to errors in the purchase accounting for our acquisition of Cantaloupe and errors in periods subsequent to the acquisition resulting from an ineffective integration of the financial systems and processes of the acquired entity with those of the Company. Such adjustments are primarily the result of:

• The Company previously recorded a conforming accounting policy adjustment in the Cantaloupe purchase price allocation to account for certain customer contracts as sales-type leases. Such adjustment was not recorded in accordance with Accounting Standards Codification 840, "Leases". Further, the Company did not prepare and maintain adequate documentation and analyses to support the initial and ongoing accounting for such arrangements.

• The Company did not have effective processes and controls to recognize adequate reserves for sales-tax, inventory valuation and bad debts.

• The Company did not have effective controls to prevent or detect a data-entry error that resulted in duplicate sales order entries and related recognition of revenue in the accounting systems.

• The Company previously capitalized certain sales commissions. The Company concluded that these costs did not meet the applicable criteria for capitalization and

should have been expensed as incurred.

• The Company previously issued shares of common stock as consideration for the acquisition of Cantaloupe and did not accurately record such shares at fair value based upon the closing price on the acquisition closing date.

The significant account and transaction review adjustments referred to in (ii) above were reflected where appropriate in the restatement of our fiscal year 2017 financial statements, in the restatement of our financial statements for the fiscal quarters and year-to-date ended September 30, 2016 and 2017, December 31, 2016 and 2017, and March 31, 2017 and 2018 appearing in Note 20 hereof, and in the restated selected financial data for fiscal years 2015, 2016 and 2017 appearing in Item 6 of this Form 10-K/A, and primarily relate to the failure to maintain an effective control environment including ensuring that required accounting methodologies, policies and supporting documentation were in place. Such adjustments are not related to the Company's acquisition and financial integration of Cantaloupe and are primarily the result of:

• Since fiscal year 2014 the Company recognized a partial tax valuation allowance on its deferred tax assets. However, starting in fiscal year 2016 the Company should have recognized a full valuation allowance on its deferred tax assets.

• The Company historically inappropriately accounted for a fiscal year 2014 sale-leaseback transaction as an operating lease. The Company should have accounted for such transaction as a capital lease.

• The Company did not have effective processes and controls to recognize adequate reserves for sales-tax. In addition, the Company did not have effective processes to evaluate and estimate the Company's reserves for bad debts, sales returns, and excess and obsolete inventory at

the lower of cost or net realizable value. It was concluded that the previous processes were based on assumptions that were not sufficiently documented or supported.

• The Company previously capitalized certain sales commissions. The Company concluded that these costs did not meet the applicable criteria for capitalization and should have been expensed as incurred.

• The Company historically incorrectly classified its convertible preferred stock within shareholders' equity on the Company's consolidated balance sheets.

On October 7, 2019, the Board of Directors of the Company, upon the recommendation of the Audit Committee, and based upon the non-investigatory adjustments referred to above, determined that the following financial statements previously issued by the Company should no longer be relied upon: (1) the audited consolidated financial statements for the fiscal year ended June 30, 2015; (2) the audited consolidated financial statements for the fiscal year ended June 30, 2016; and (3) the quarterly and year-to-date unaudited consolidated financial statements for September 30, 2016, December 31, 2016, and March 31, 2017.

145.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

**Additional Allegations Demonstrating Scienter**

146.   The magnitude and breadth of the Company's restatement of its financial results, as set forth in the chart in ¶142, *supra,* demonstrates scienter.

147.   The Company's violation of fundamental GAAP as well as violations of its own internal accounting rules, demonstrates scienter.

148.   The inflated results that the Company reported enabled it to report "record" results with laudable year-over-year growth, demonstrating scienter.

149.   The inflated results that the Company reported was the basis of incentive compensation, enabling Defendants Herbert and Singh, as well as other Company executives, to profit from their fraud, demonstrating scienter.

150.   The Company's carrying out of the SPO on the basis of fraudulent financial results, enabling it to raise over $75 million, further demonstrates scienter.

151.   The demotions and departures of Herbert, Singh, Lawlor, Duska, and Harrum, showing that the Company's highest-level managers were responsible for its accounting fraud, further demonstrate scienter.

**Defendants' Violations of GAAP, SEC Rules and Regulations, and USAT's Internal Accounting Policies**

152.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. (ASC 105-10-05-1) Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are

presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

153.   The Company represented its financial position and results of operations in a manner which materially violated GAAP, including the following fundamental financial reporting principles and objectives:

a.   The objective that financial reporting should provide financial information that is useful to existing and potential investors, lenders and other creditors in making investment, credit and similar decisions was violated (FASB Statement of Concepts ("CON") No. 8, ¶OB2);

b.   The objective that financial reporting should provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity, and effects of transactions and other events that change a reporting entity's economic resources and claims was violated (CON 8, ¶OB12);

c.   The objective that information about a reporting entity's financial performance should help financial statement users to understand the

return the entity has produced on its economic resources was violated. Information about the return the entity has produced provides an indication of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources. Information about the variability and components of that return also is important, especially in assessing the uncertainty of future cash flows. Information about a reporting entity's past financial performance and how its management discharged its responsibilities usually is helpful in predicting the entity's future returns on its economic resources. (CON 8, ¶OB16);

d. The principle that a reporting entity's accrual accounting should depict the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period, was violated. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period.

Information about a reporting entity's financial performance during a period, reflected by changes in its economic resources and claims other than by obtaining additional resources directly from investors and creditors, is useful in assessing the entity's past and future ability to generate net cash inflows. That information indicates the extent to which the reporting entity has increased its available economic resources, and thus its capacity for generating net cash inflows through its operations rather than by obtaining additional resources directly from investors and creditors. (CON 8 ¶¶OB17 – OB18);

e.  The principle that financial information should be useful, which means that it must be relevant and faithfully represent what it purports to represent, was violated. Relevance and faithful representation are fundamental qualitative characteristics of useful financial information. (CON 8, ¶¶QC4 – QC5);

f.  The principle of relevance was violated in that material information of predictive or confirmatory value capable of making a difference in the decisions made by financial statement users was misrepresented (CON 8, ¶¶QC6 – QC7, QC11);

g. The principle of faithful representation was violated in that financial information was not complete, neutral, or free from error (CON 8, ¶QC12);

h. The principle of completeness, which means including all information necessary for a financial statement user to understand the phenomenon being depicted, was violated (CON 8, ¶QC13;

i. The principle of neutral depiction, meaning selection or presentation of financial information without bias, was violated. (CON 8, ¶QC14); and

j. The principle of faithful representation was violated due to errors and omissions in selecting and applying appropriate processes to produce the reported information and in its presentation (CON 8, ¶QC15); and

k. The revenue recognition principle that revenues are recognized when they are realized or realizable and earned was violated. (CON 5 ¶83; ASC 605-10-25-1). Revenue is generally realized and realizable when all of the following conditions are met: 1) persuasive evidence of an arrangement exists, 2) delivery has occurred or services have been rendered, 3) the seller's price is fixed

or determinable, and 4) collectability is reasonably assured. (ASC
605-10-S99-1, SAB Topic 13).

154.   USAT's violations of specific GAAP requirements during the Class
Period are detailed below.

155.   *Revenue Recognition*: Revenues are recognized when they are realized
or realizable and earned. (CON 5 ¶83; ASC 605-10-25-1). Revenue is generally
realized and realizable when all of the following conditions are met: 1) persuasive
evidence of an arrangement exists, 2) delivery has occurred or services have been
rendered, 3) the seller's price is fixed or determinable, and 4) collectability is
reasonably assured. (ASC 605-10-S99-1, SAB Topic 13). Additionally, GAAP
requires payments or other consideration provided to customers which constitute an
adjustment of the selling price to be recorded as a reduction of revenues rather than
a cost or an expense in the vendor's income statement. (ASC 605-50-45)

156.   If an entity gives the buyer a right to return its product, revenue from
the sales transaction is only recognized at the time of sale if all of the following
conditions are met: a) the seller's price is substantially fixed or determinable at the
date of sale, b) the buyer has paid, or is contractually obligated to pay, the seller and
the buyer's obligation is not contingent on resale of the product, c) the buyer's
obligation to the seller would not be changed in the event of theft or physical
destruction or damage to the product, d) the buyer acquiring product for resale has

economic substance apart from that provided by the seller, e) the seller does not have significant obligations for future performance to directly bring about the resale of the product by the buyer, and lastly, f) the amount of future returns can be reasonably estimated. (ASC 605-15-25-1)

157.    The following factors may impair an entity's ability to make a reasonable estimate of the amount of future returns:

a.   The susceptibility of the product to significant external factors, such as technological obsolescence or changes in the demand.

b.   Relatively long periods in which a particular product may be returned.

c.   Absence of historical experience with similar types of sales of similar product, or inability to apply such experience because of changing circumstances, for example, changes in the selling entity's marketing policies or relationships with its customers.

d.   Absence of large volume of relatively homogeneous transactions. (ASC 605-15-25-3)

158.    When a company recognizes sales with the right of return, it records the estimated sales returns in a contra-revenue account (i.e., as a reduction of revenues) and establishes a corresponding reserve (i.e., a liability account) for sales returns. (ASC 605-15-25-2; ASC 450-20-25) "Sales revenue and cost of sales that are not

recognized at the time of sale because the foregoing conditions are not met shall be recognized either when return privilege has substantially expired or if those conditions subsequently are met, whichever occurs first." (ASC 605-15-25-1)

159.   Additionally, GAAP requires payments or other consideration provided to customers which constitute an adjustment of the selling price to be recorded as a reduction of revenues rather than a cost or an expense in the vendor's income statement. (ASC 605-50-45)

160.   Throughout the Class Period, USAT stated that it accounted for revenues in accordance with GAAP, stating in the 2017 10-K:

> In all cases, revenue is only recognized when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the price is fixed and determinable, and collection of the resulting receivable is reasonably assured. The Company estimates an allowance for product returns at the date of sale and license and transaction fee refunds on a monthly basis.

161.   However, in its 2019 10-K and 2019 10-K/A, USAT admitted that it violated GAAP and its own revenue recognition policy. The Audit Committee's investigation revealed that Defendants prematurely and/or improperly recognized revenue and number of connections. The Company also admitted that its previously recorded sales returns reserves were not appropriately supported. Moreover, USAT admitted further inflating revenues by improperly recording certain charges as expenses rather than contra-revenue items in earlier fiscal quarters:

**2019 10-K**

**Material Weaknesses Identified and Remedial Measures Implemented Based upon Audit Committee Investigation.**

\* \* \*

Pressure to achieve sales targets gave rise to the premature and/or inappropriate recognition of revenues and reporting of connections associated with certain of the examined transactions, typically occurring at or near the end of financial reporting periods;

\* \* \*

**Material Weaknesses Identified and Remedial Measures Implemented as a Result of Non-Investigatory Issues Identified During the Audit Process.**

\* \* \*

Due to incorrect historical accounting treatment, the Company wrote off the outstanding inventory on the balance sheet relating to obsolete inventory during the 2015 through 2019 fiscal years which was returned to the Company by customers in exchange for new equipment as the Company did not have a history of collecting these items and the equipment was obsolete.

**2019 10-K/A**

On January 14, 2019, the Company reported that the Audit Committee's internal investigation relating to accounting and reporting matters was substantially completed, the principal findings of the internal investigation, and the remedial actions to be implemented by the Company as a result of the internal investigation. The Audit Committee found that, for certain of the customer transactions under review, the Company had prematurely recognized

revenue. The Audit Committee proposed certain adjustments to previously reported revenues related to fiscal quarters occurring during the 2017 and 2018 fiscal years of the Company. In most cases, revenues that had been recognized prematurely were, or were expected to be, recognized in subsequent quarters, including quarters subsequent to the quarters impacted by the investigative findings. The investigation further found that certain items that had been recorded as expenses, such as the payment of marketing or servicing fees, were more appropriately treated as contra-revenue items in earlier fiscal quarters.

* * *

… the Company did not have effective processes to evaluate and estimate the Company's reserves for … sales returns… . It was concluded that the previous processes were based on assumptions that were not sufficiently documented or supported.

162.   USAT's failure to follow GAAP in accounting for the Company's revenues had the effect of materially misstating its financial statements during the Class Period.

163.   *Accounting for the acquisition of Cantaloupe*: GAAP requires business combinations to be accounted for using the acquisition method of accounting which involves allocating the purchase price to identifiable assets acquired and liabilities assumed in a business combination as well as recording goodwill. (ASC 805-10-05-4, ASC 805-10-25-1.)

164.   The purchase price in a business combination is generally measured at fair value and is calculated as the sum of the acquisition date fair value of the assets

transferred by the acquirer (such as cash and other assets), the liabilities incurred by the acquirer to former owners of the acquire (such as an earn-out), and the equity interests issued by the acquirer (such as common or preferred stock). (ASC 805-30-30-7) The identifiable assets acquired and liabilities assumed are recorded on the acquirer's balance sheet at fair value on the acquisition date. (ASC 805-20-30-1) Fair value is defined in GAAP as the price that would be received from the sale of an asset or paid to transfer a liability in an orderly transaction between market-participants. (ASC 820-10-20.)

165.   USAT has admitted that it violated GAAP in accounting for the acquisition of Cantaloupe. The 2019 10-K and 2019 10-K/A disclosed that the Company, in violation of GAAP, did not measure the purchase price at fair value, failed to record the acquired assets and liabilities at fair value, and failed to recognize the correct amount of goodwill from the acquisition.

166.   More specifically, USAT erroneously valued the 3,423,367 shares of common stock it issued in connection with the acquisition at the "weighted average stock price for the period leading up to the closing of the transaction" instead of at the stock price on the date of the acquisition, which resulted in understating the Company's goodwill and equity by approximately $3.5 million. USAT also admitted that it not only failed to measure at fair value the Cantaloupe assets and liabilities it acquired, but also failed to account for Cantaloupe's activities subsequent to the

acquisition in accordance with GAAP due to material weaknesses in the Company's

internal controls:

### 2019 10-K

Management did not effectively design controls in response to the risks of material misstatement and specifically did not have an adequate process or appropriate business combination controls in place to prevent or detect material errors in the financial statements of Cantaloupe, our subsidiary acquired on November 9, 2017. There was not a full nor effective financial integration of Cantaloupe resulting in significant adjustments as follows:

- Certain trade and finance receivables relating to customer leasing/rental contracts of Cantaloupe were double counted by the Company on the opening balance sheet, and the Company's sales-type lease accounting policy was not consistently or accurately applied by the Company to these contracts subsequent to the date of the acquisition.

- In several cases, current management reversed previously recorded revenue associated with certain incorrect customer transactions and recorded accruals for potential uncollectible amounts due from customers.

- Management has now determined the correct original amount of finance receivables and the proper balance for this and the other assets and liabilities acquired by the Company in its acquisition of Cantaloupe.

- Cantaloupe's goodwill had been incorrectly calculated using the Company's weighted average stock price for the period leading up to the closing of the transaction. Current management has

determined that the stock should have been valued on the November 9, 2017 opening balance sheet using the sale price on the date of closing resulting in an increase of approximately $3.5 million to goodwill and equity.

We have concluded that we did not have appropriate financial reporting controls and processes in place to prevent or detect material errors in the financial statements of Cantaloupe on and subsequent to the acquisition, the financial integration of Cantaloupe was not adequately or consistently performed, and certain accounting practices were not implemented in order to conform to the Company's existing accounting policies and generally accepted accounting principles in the United States.

## 2019 10-K/A

The acquisition and financial integration-related adjustments … were reflected in the restatement of the financial statements for the fiscal quarters and year-to-date ended December 31, 2017 and March 31, 2018 … , and relate to errors in the purchase accounting for our acquisition of Cantaloupe and errors in periods subsequent to the acquisition resulting from an ineffective integration of the financial systems and processes of the acquired entity with those of the Company. Such adjustments are primarily the result of:

• The Company previously recorded a conforming accounting policy adjustment in the Cantaloupe purchase price allocation to account for certain customer contracts as sales-type leases. Such adjustment was not recorded in accordance with Accounting Standards Codification 840, "Leases". Further, the Company did not prepare and maintain adequate documentation and analyses to support the initial and ongoing accounting for such arrangements.

• The Company did not have effective processes and controls to recognize adequate reserves for sales-tax, inventory valuation and bad debts.

• The Company did not have effective controls to prevent or detect a data-entry error that resulted in duplicate sales order entries and related recognition of revenue in the accounting systems.

• The Company previously capitalized certain sales commissions. The Company concluded that these costs did not meet the applicable criteria for capitalization and should have been expensed as incurred.

• The Company previously issued shares of common stock as consideration for the acquisition of Cantaloupe and did not accurately record such shares at fair value based upon the closing price on the acquisition closing date.

167.  USAT's failure to follow GAAP in accounting for the Cantaloupe acquisition and Cantaloupe's activities subsequent to the acquisition had the effect of materially misstating USAT's financial statements during the class period beginning with 2Q 2018.

168.  *Deferred income tax accounting*: in general, most items that enter into pretax accounting income for book purposes enter into taxable income in the same year, and vice versa. However, some events are recognized for book purposes and tax purposes in different years. Over time, as these differences reverse, they eventually offset each other. The tax effects of these differences, referred to as deferred taxes, should be accounted for in the intervening periods. GAAP requires financial statements to reflect the current and deferred tax consequences of all events

that have been recognized in the financial statements or tax returns. (ASC 740) To accomplish this goal, GAAP provides the following basic principles:

l.  A current tax liability or asset is recognized for the estimated taxes payable or refundable on tax returns for the current and prior years.

m. A deferred tax liability or asset is recognized for the estimated future tax effects attributable to temporary differences and carryforwards.

n.  The measurement of current and deferred tax liabilities and assets is based on provisions of the enacted tax law.

o.  The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

169.   A deferred tax asset is an income tax reduction whose recognition is delayed due to deductible temporary differences[1] and carryforwards.[2] (ASC 740-10-20) GAAP requires that a valuation allowance for a deferred tax asset be created if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50%) that the company will not realize some portion or all of the deferred tax asset. The valuation allowance must be sufficient to reduce the deferred tax asset

---

[1] Deductible temporary differences are temporary differences that result in deductible amounts in future years.

[2] Carryforwards are deductions or credits that cannot be utilized on the tax return during a year that may be carried forward to reduce taxable income or taxes payable in a future year.

to the amount that is more likely than not to be realized. (ASC 740-10-30-5) The need for a valuation allowance is especially likely if a business has a history of letting various carryforwards expire unused, or it expects to incur losses in the next few years. (ASC 740-10-30-16 – 25) Generally, changes in a valuation allowance, including increasing a valuation allowance to 100% of the amount of the related deferred tax asset, are reflected in the income statement. (ASC 740-10-45.)

170.   The following table shows the deferred tax asset balance USAT originally reported beginning in fiscal year 2016 through the end of 3Q 2018:

| ($ in millions) | FY16 6/30/16 | 1Q 2017 9/30/16 | 2Q 2017 12/31/16 | 3Q 2017 3/31/17 | FY17 6/30/17 | 1Q 2018 9/30/17 | 2Q 2018 12/31/17 | 3Q 2018 3/31/18 |
|---|---|---|---|---|---|---|---|---|
| Deferred tax assets, net of allowance | $ 27.7 | $ 28.0 | $ 28.0 | $ 27.6 | $27.7 | $ 28.2 | $ 14.8 | $ 16.9 |

171.   Throughout the Class Period, USAT stated that it accounted for income taxes in accordance with GAAP:

> Income taxes are computed using the asset and liability method of accounting. Under the asset and liability method, a deferred tax asset or liability is recognized for estimated future tax effects attributable to temporary differences and carryforwards. The measurement of deferred income tax assets is adjusted by a valuation allowance, if necessary, to recognize future tax benefits only to the extent, based on available evidence, it is more likely than not such benefits will be realized.

172.    However, in its 2019 10-K and 2019 10-K/A, USAT has admitted that it violated GAAP and its own policy in accounting for deferred tax assets and that it

should have fully reserved its deferred tax assets (i.e., reduced their book value to zero) for the year ended June 30, 2016 and onward:

**2019 10-K:**

The Company has determined to fully restore its income tax valuation allowance which resulted in a charge to the income statement and a corresponding reduction to retained earnings in fiscal year 2016 due to the lack of supporting evidence for its accounting position.

\* \* \*

The Company has significant deferred tax assets, a substantial amount of which result from operating loss carryforwards. The Company routinely evaluates its ability to realize the benefits of these assets to determine whether it is more likely than not that such benefit will be realized. In periods prior to the year ended June 30, 2014, the Company's evaluation of its ability to realize the benefit from its deferred tax assets resulted in a full valuation allowance against such assets. Based upon earnings performance that the Company had achieved along with the belief that such performance would continue into future years, the Company determined during the year ended June 30, 2014 that it was more likely than not that a substantial portion of its deferred tax assets would be realized with approximately $64 million of its operating loss carryforwards being utilized to offset corresponding future years' taxable income resulting in a reduction in its valuation allowances recorded in prior years. However, due to the adjustments to earnings and management's reassessment of the underlying factors it uses in estimating future taxable income, and in accordance with the history of losses generated, the Company believes that for the year ended June 30, 2016 and onward, it is more likely than not that its deferred tax assets will not be realized. Accordingly, the Company re-

established a full valuation allowance on its net deferred tax assets.

**2019 10-K/A:**

Since fiscal year 2014 the Company recognized a partial tax valuation allowance on its deferred tax assets. However, starting in fiscal year 2016 the Company should have recognized a full valuation allowance on its deferred tax assets.

173.    USAT's failure to follow GAAP in accounting for its deferred tax assets had the effect of materially misstating USAT's financial statements during the class period.

174.    *Inventory valuation*: GAAP requires inventory to be valued at the lower of cost or net realizable value.[3] When evidence exists that the net realizable value of inventory is less than its cost, the difference shall be recognized as a loss in earnings in the period in which it occurs. That loss may be required, for example, due to damage, physical deterioration, obsolescence, changes in price levels, or other causes. (ASC 330-10-35-1B)

175.    Throughout the Class Period, USAT stated that it accounted for revenues in accordance with GAAP, stating in the 2017 10-K:

Inventory consists of finished goods. The company's inventories are valued at the lower of cost or net realizable value.

---

[3] Net realizable value is defined as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. (ASC 330-10-20.)

> The Company establishes allowances for obsolescence of inventory based upon quality considerations and assumptions about future demand and market conditions.

176. However, in its 2019 10-K and 2019 10-K/A, USAT admitted that it violated GAAP and its own policy in valuing its inventory:

**2019 10-K:**

> Due to incorrect historical accounting treatment, the Company wrote off the outstanding inventory on the balance sheet relating to obsolete inventory during the 2015 through 2019 fiscal years which was returned to the Company by customers in exchange for new equipment as the Company did not have a history of collecting these items and the equipment was obsolete.

> The Company had to revise its excess and obsolete inventory reserve analysis to conform with generally accepted accounting principles in the United States as the Company lacked supporting evidence for its historical reserve analysis.

**2019 10-K/A:**

> … the Company did not have effective processes to evaluate and estimate the Company's reserves for … excess and obsolete inventory at the lower of cost or net realizable value. It was concluded that the previous processes were based on assumptions that were not sufficiently documented or supported.

177. Moreover, in its 2019 10-K/A, the Company admitted that lack of "effective processes and controls to recognize adequate reserves for … inventory valuation," among others, led it to make errors in accounting for the acquisition of Cantaloupe and in periods subsequent to the acquisition.

178.   USAT's failure to follow GAAP in accounting for inventory valuation had the effect of materially misstating USAT's financial statements during the Class Period.

179.   *Sale-leaseback accounting*: there are two principal lease classifications on a lessee's financial statements: an operating lease and a capital lease. An operating lease is any lease other than a capital lease. A capital lease is a lease that meets any one of the four criteria specified in GAAP:

    a.   The lease transfers ownership of the property to the lessee by the end of the lease term.

    b.   The lease contains a bargain purchase option.

    c.   The lease term is equal to 75% or more of the estimated economic life of the leased property.

    d.   The present value of the minimum lease payments at the beginning of the lease is at least 90% of the fair value of the asset at the inception of the lease. (ASC 840-10-25-1, ASC 840-10-20)

180.   The difference in accounting for an operating lease and a capital lease consists of the following:

    a.   Each lease payment under an operating lease is recorded as an expense. Neither, the leased asset, nor an obligation to make future payments is recorded on the lessee's books. (ASC 840-20-25-1.)

b. Under a capital lease, the present value of all lease payments is considered to be the cost of the asset, which is recorded as a fixed asset, with an offsetting obligation recorded as a capital lease liability. As each monthly lease payment is made to the lessor, the lessee records a combined reduction in the capital lease liability account and a charge to interest expense. The lessee also records a periodic depreciation charge to gradually reduce the carrying amount of the fixed asset in its accounting records. (ASC 840-30-25-1, ASC 840-30-30-1, ASC 840-30-35.)

181.   When a sale of a property is accompanied by a leaseback of all or any part of the property for all or part of its remaining economic life and the lease meets any of the aforementioned four capital lease criteria, the seller-lessee shall account for the lease as a capital lease. Otherwise, the seller-lessee shall account for the lease as an operating lease. (ASC 840-40-25-2.)

182.   As disclosed in USAT's 2017 10-K, "during the fiscal year ended June 30, 2014, the Company and a third party finance company, entered into the six Sale Leaseback Agreements pursuant to which the third-party finance company purchased ePort equipment owned by the Company and used by the Company in its JumpStart Program." The Company initially recorded the sale-leaseback arrangement as an operating lease. However, "during the fiscal year ended June 30,

2017, the Company extended the termination date for each of the six Sales Leaseback Agreements with the third party financing company for an additional year and the extension will also result in the transfer of ownership of the leased assets to the Company at the end of the new term. As a result of the new provision for ownership transfer at the end of the lease, the Sale Leaseback Agreements previously considered to be operating leases are classified as capital leases at June 30, 2017 and the remaining deferred gain at the time of the extension will be amortized ratably over the remaining estimated useful lives of the related property and equipment, through the fourth quarter of 2019."

183.   In its 2019 10-K, USAT revised the gain on sale of the ePort equipment from $1.45 million to $2.6 million and admitted that "the original accounting treatment of a 2014 fiscal year sale-leaseback transaction as an operating lease was incorrect, and should have been treated as a capital lease and appropriate adjustments have been recorded during fiscal years 2015 through 2019." The Company then admitted in its 2019 10-K/A that it "historically inappropriately accounted for a fiscal year 2014 sale-leaseback transaction as an operating lease. The Company should have accounted for such transaction as a capital lease."

184.   USAT's failure to follow GAAP in accounting for its 2014 sale-leaseback transaction had the effect of materially misstating USAT's financial statements during the Class Period.

185.   *Balance sheet classification of preferred stock*: public companies are required to present contingently redeemable preferred stock (i.e., redeemable upon the occurrence of an event outside the control of the issuer) and preferred stock that is redeemable at the option of the holder, in mezzanine equity. (ASC 480-10-S99-3A.) Mezzanine equity is presented after liabilities and before stockholders' equity on the balance sheet. The purpose of this classification is to convey to the reader that such a security may not be permanently part of equity and could result in a demand for cash or other assets of the entity in the future. Reporting entities should present redeemable securities that are classified as mezzanine equity separate from stockholders' equity accounts that are classified as permanent equity (e.g., non redeemable preferred, common stock, and retained earnings).

186.   USAT has admitted that it violated GAAP in accounting for the preferred stock. The 2019 10-K disclosed that even though its convertible preferred stock is contingently redeemable due to the existence of deemed liquidation provisions contained in its certificate of incorporation, the Company had improperly classified it as part of the shareholders' equity on its balance sheet in violation of GAAP. The Company then admitted in its 2019 10-K/A that it "historically incorrectly classified its convertible preferred stock within shareholders' equity on the Company's consolidated balance sheets.

187.   USAT's failure to follow GAAP in classifying its preferred stock on its balance sheets had the effect of materially misstating USAT's financial statements during the Class Period.

188.   *Bad debt reserves*: accounts receivable are commonly paired with the allowance for doubtful accounts, a contra asset account which stores a reserve for bad debts. (ASC 210-10-45-13, CON 6 ¶ 34.) The combined balances in the accounts receivable and allowance accounts represent the net carrying value of accounts receivable. GAAP requires losses from uncollectable receivables to be accrued by a charge to income when such loss is probable (i.e., likely to occur) and estimable. (ASC 310-10-35-8 – 11, ASC 450-20-25-1 – 2.)

189.   Throughout the Class Period, USAT stated that it valued accounts receivable in accordance with GAAP, stating in the 2017 10-K:

> The Company maintains an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments, including from a shortfall in the customer transaction fund flow from which the Company would normally collect amounts due.
>
> The allowance is determined through an analysis of various factors including the aging of the accounts receivable, the strength of the relationship with the customer, the capacity of the customer transaction fund flow to satisfy the amount due from the customer, an assessment of collection costs and other factors. The allowance for doubtful accounts receivable is management's best estimate as of the respective reporting date. The Company writes off accounts receivable against

the allowance when management determines the balance
is uncollectible and the Company ceases collection efforts.
Management believes that the allowance recorded is
adequate to provide for its estimated credit losses.

190.   Although in its 2017 10-K the Company represented that it successfully
remediated material weaknesses in its internal controls over financial reporting,
including those related to determining the collectability of accounts receivable, the
2019 10-K, revealed that USAT's previously issued financial statements dating back
to fiscal year 2015 were misstated, in part, due to its failure to properly account for
reserves for bad debts.

191.   The Company then admitted in its 2019 10-K/A that "the Company did
not have effective processes to evaluate and estimate the Company's reserves for
bad debts … . It was concluded that the previous processes were based on
assumptions that were not sufficiently documented or supported." Moreover, the
Company admitted that lack of "effective processes and controls to recognize
adequate reserves for … bad debts," among others, led it to make errors in
accounting for the acquisition of Cantaloupe and in periods subsequent to the
acquisition.

192.   USAT's failure to follow GAAP in accounting for bad debt reserves
had the effect of materially misstating USAT's financial statements during the Class
Period.

193.   *Sales tax reserves*: liabilities are probable future sacrifices of economic benefits arising from present obligations of a particular entity to transfer assets or provide services to other entities in the future as a result of past transactions or events. (CON 6 ¶ 35.)

194.   Although in its 2017 10-K the Company represented that it successfully remediated material weaknesses in its internal controls over financial reporting, including implementing internal controls related to "search for an analysis of unrecorded liabilities prior to period close," the 2019 10-K, revealed that USAT's previously issued financial statements were misstated, in part, due to its failure to record "an accrual for the payment of sales taxes in certain states for certain products which affected fiscal years 2016 through 2019 due to the failure to historically account for these matters." USAT's 2019 10-K disclosed that "during the year ended June 30, 2019, the Company identified sales tax liabilities and related interest in the aggregate amount of $16.6 million." The Company then admitted in its 2019 10-K/A that it "did not have effective processes and controls to recognize adequate reserves for sales-tax. … It was concluded that the previous processes were based on assumptions that were not sufficiently documented or supported." Moreover, the Company admitted that lack of "effective processes and controls to recognize adequate reserves for sales tax," among others, led it to make errors in accounting for the acquisition of Cantaloupe and in periods subsequent to the acquisition

195.   In addition to adjustments made to correct the above misstatements, USAT also noted in its 2019 10-K that it "has reversed certain costs which were previously incorrectly capitalized and has now appropriately reclassified debt." The 2019 10-K/A revealed that the "[t]he Company previously capitalized certain sales commissions. The Company concluded that these costs did not meet the applicable criteria for capitalization and should have been expensed as incurred." Moreover, the Company admitted that improper capitalization of sales commissions, was one of the errors which led it to improperly account for the acquisition of Cantaloupe and make errors in periods subsequent to the acquisition.

196.   The total impact of the aforementioned GAAP violations on the Company's financial statements filed with the SEC during the Class Period is summarized below based on the information disclosed in the 2019 10-K:

| ($ in thousands, except per share data) | Fiscal Year Ended 6/30/2017 | Three Months Ended | | | Total FY 2017 - 3Q 2018 |
|---|---|---|---|---|---|
| | | 9/30/2017 (1Q 2018) | 12/31/2017 (2Q 2018) | 3/31/2018 (3Q 2018) | |
| **Total Revenue** | | | | | |
| As prev. rptd. | $ 104,093 | $ 25,617 | $ 32,506 | $ 35,832 | $ 198,048 |
| As Restated | $ 101,436 | $ 25,259 | $ 31,532 | $ 33,592 | $ 191,819 |
| Misstated $ | $ (2,657) | $ (358) | $ (974) | $ (2,240) | $ (6,229) |
| Misstated % | -2.6% | -1.4% | -3.1% | -6.7% | -3.2% |
| | | | | | |
| **Gross Profit** | | | | | |
| As prev. rptd. | $ 26,646 | $ 7,201 | $ 9,201 | $ 11,944 | $ 54,992 |
| As Restated | $ 25,061 | $ 6,181 | $ 9,172 | $ 9,845 | $ 50,259 |
| Misstated $ | $ (1,585) | $ (1,020) | $ (29) | $ (2,099) | $ (4,733) |
| Misstated % | -6.3% | -16.5% | -0.3% | -21.3% | -9.4% |
| | | | | | |
| **Loss before income taxes** | | | | | |
| As prev. rptd. | $ (1,765) | $ (681) | $ (3,443) | $ (978) | $ (6,867) |
| As Restated | $ (7,370) | $ (2,143) | $ (4,351) | $ (3,203) | $ (17,067) |
| Misstated $ | $ (5,605) | $ (1,462) | $ (908) | $ (2,225) | $ (10,200) |
| Misstated % | 76.1% | 68.2% | 20.9% | 69.5% | 59.8% |
| | | | | | |
| **Net loss applicable to common shares** | | | | | |
| As prev. rptd. | $ (2,520) | $ (547) | $ (12,516) | $ 826 | $ (14,757) |
| As Restated | $ (8,133) | $ (2,505) | $ (4,194) | $ (3,557) | $ (18,389) |
| Misstated $ | $ (5,613) | $ (1,958) | $ 8,322 | $ (4,383) | $ (3,632) |
| Misstated % | 69.0% | 78.2% | -198.4% | NM | 19.8% |
| | | | | | |
| **Net loss per common share** | | | | | |
| As prev. rptd. | $ (0.06) | $ (0.01) | $ (0.24) | $ 0.02 | |
| As Restated | $ (0.20) | $ (0.05) | $ (0.08) | $ (0.07) | |
| Misstated $ | $ (0.14) | $ (0.04) | $ 0.16 | $ (0.09) | |
| Misstated % | 70.0% | 80.0% | -200.0% | NM | |
| | | | | | |
| NM - not meaningful | | | | | |

| ($ in thousands, except per share data) | As of Ended 6/30/2017 | As of 9/30/2017 (1Q 2018) | As of 12/31/2017 (2Q 2018) | As of 3/31/2018 (3Q 2018) |
|---|---|---|---|---|
| **Total assets** | | | | |
| As prev. rptd. | $ 97,691 | $135,219 | $ 184,651 | $191,393 |
| As Restated | $ 67,544 | $103,860 | $ 166,934 | $168,728 |
| Misstated $ | $ (30,147) | $ (31,359) | $ (17,717) | $ (22,665) |
| Misstated % | -44.6% | -30.2% | -10.6% | -13.4% |
| | | | | |
| **Total liabilities** | | | | |
| As prev. rptd. | $ 31,913 | $ 29,123 | $ 70,481 | $ 75,482 |
| As Restated | $ 39,938 | $ 38,068 | $ 81,475 | $ 86,120 |
| Misstated $ | $ 8,025 | $ 8,945 | $ 10,994 | $ 10,638 |
| Misstated % | 20.1% | 23.5% | 13.5% | 12.4% |
| | | | | |
| **Total shareholders' equity** | | | | |
| As prev. rptd. | $ 65,778 | $106,096 | $ 114,170 | $115,911 |
| As Restated | $ 24,468 | $ 62,661 | $ 82,321 | $ 79,470 |
| Misstated $ | $ (41,310) | $ (43,435) | $ (31,849) | $ (36,441) |
| Misstated % | -168.8% | -69.3% | -38.7% | -45.9% |

197.   An error in financial statements exists when those financial statements contain an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared. (ASC 250-10-20.) GAAP requires that errors in financial statements be corrected retrospectively by restating the previously issued financial statements. (ASC 250-10-05-4.) The restated financial statements should disclose, inter alia, the nature of the error, the effect of the correction on each financial statement line item and any per-share amounts affected (ASC 250-10-50-7 – 8.) Because GAAP provisions do not apply to immaterial items, a restatement is only warranted when the previously issued financial statements are materially misstated.

(ASC 105-10-05-6.) Therefore, a restatement of a Company's financial statements is an admission that the previously issued financial statements were materially misstated.

198.    The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item. (CON 8 ¶ QC11.) Assessment of whether an item is material involves performing not only a quantitative but also a qualitative assessment. According to the SEC, materiality assessment should consider the "total mix" of information. In other words, "materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." (Staff Accounting Bulletin No. 99 ("SAB 99") – Materiality.)

199.    USAT has admitted that its financial statements were materially false by telling investors that at least nine quarters of financial reports could no longer be relied on and restating the financial statements for those periods.

200.    In addition, Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:

A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

   i. transactions are executed in accordance with management's general or specific authorization;

   ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

   iii. access to assets is permitted only in accordance with management's general or specific authorization; and

   iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

201.   A strong system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. It is management's

responsibility to evaluate, with the participation of the CEO and the CFO, the effectiveness of the company's internal controls over financial reporting as of the end of each fiscal year. (Exchange Act Rules 13a-15(c) and 15d-15(c) [17 C.F.R. §§ 240.13a-15(c) and 240.15d-15(c)]). In its 2017 10-K, USAT disclosed that the Company's management performed its evaluations in accordance with criteria set forth the COSO Framework.[4]

202.   The COSO Framework defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting and non-financial reporting, and compliance with applicable laws and regulations.[5] Internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

203.   According to COSO Framework, "setting objectives is a prerequisite to internal control and a key part of the management process relating to strategic

---

[4] The original COSO framework was issued in 1992. In May 2013 COSO issued an updated Internal Control – Integrated Framework.

[5] COSO Framework, Chapter 1.

planning."[6] "Management, with board oversight, sets entity-level objectives that align with the entity's mission, vision, and strategies. … External reporting objectives are driven primarily by regulations and/or standards established by regulators and standard-setting bodies. … —Entities need to achieve external financial reporting objectives to meet obligations to and expectations of stake holders. Financial statements are necessary for accessing capital markets and may be critical to being awarded contracts or in dealing with suppliers and vendors. Investors, analysts, and creditors often rely on an entity's external financial statements to assess its performance against peers and alternative investments. Management may also be required to publish financial statements using objectives set forth by rules, regulations, and external standards."[7]

204.   The COSO Framework defines five components of an internal control that are needed to enable a business to achieve its objectives: (1) control environment, (2) risk assessment, (3) control activities, (4) information and communication, and (5) monitoring activities.

---

[6] COSO Framework, Chapter 2.

[7] COSO Framework, Chapter 2.

205.   Of the five components of internal control, the control environment has a pervasive impact on the overall system of internal control.[8] The "tone at the top" is an essential element of the control environment. "The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct."[9] "The board of directors and management at all levels of the entity demonstrate through their directives, actions, and behavior the importance of integrity and ethical values to support the functioning of the system of internal control. … Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon."[10] The COSO Framework recognizes that the CEO – during the Class Period, Defendant Herbert –, more than any other individual in an organization, sets the "tone at the top" that

---

[8] COSO Framework, Chapter 5.

[9] COSO Framework, Chapter 5.

[10] COSO Framework, Chapter 5.

affects the control environment and all other components of internal control.[11]
Moreover, the CEO "is responsible for designing, implementing, and conducting an
effective system of internal control."[12] The COSO Framework makes it clear that, in
addition to the CEO, other members of senior management, such as the CFO –
during the Class Period, Defendant Singh – play a critical role in setting the tone at
the top and performing vital internal control functions.[13]

206.   USAT's CEO, Herbert, and its CFO, Singh, failed to comply with SEC
regulations and the requirements of COSO Framework. As described herein, there
were material weaknesses in internal control at USAT that were necessary to prepare
accurate financial statements and ensure compliance with regulatory filing
requirements applicable to public companies. A material weakness is defined by the
SEC as "a deficiency, or a combination of deficiencies, in internal control over
financial reporting, such that there is a reasonable possibility that a material
misstatement of the registrant's annual or interim financial statements will not be
prevented or detected on a timely basis." (Rule 1-02(a)(4) of Regulation S-X [17
C.F.R. 210.1-02(a)(4)].) The Company's own admissions, in the January 14, 2019
8-K and the February 6, 2019 8-K, show that its internal controls were ineffective

---

[11] COSO Framework, Appendix B.

[12] COSO Framework, Appendix B.

[13] COSO Framework, Chapter 5 and Appendix B.

and materially deficient, causing it to make material errors in revenue recognition and *lie to its own auditor.* USAT's internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above, and Defendants Herbert and Singh thus failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP. The existence of these material weaknesses enabled the Defendants to recklessly or knowingly misstate USAT's restated financial results, which Herbert and Singh certified in false SOX certifications.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

207.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of 1) the Exchange Act Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of USAT during the Class Period, and 2) the Securities Act Subclass, including all those who purchased or otherwise acquired USAT common stock in the SPO; and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Exchange Act Class and Securities Act Subclass are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

208.   The members of the Exchange Act Class and the Securities Act Subclass are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. The Company sold over 5.5 million shares of USAT stock in the SPO. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class and the Securities Act Subclass. Record owners and other members of the Exchange Act Class and the Securities Act Subclass may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

209.   Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class and the UPR Retirement Fund's claims are typical of the claims of members of the Securities Act Subclass as all members of the Exchange Act Class and the Securities Act Subclass, respectively, are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

210.   Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and the Securities Act Subclass and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no

interests antagonistic to or in conflict with those of the Exchange Act Class and the Securities Act Subclass.

211.   Common questions of law and fact exist as to all members of the Exchange Act Class and the Securities Act Subclass predominate over any questions solely affecting individual members of the Exchange Act Class and the Securities Act Subclass. Among the questions of law and fact common to the Exchange Act Class and the Securities Act Subclass are:

(a)   whether Defendants' acts as alleged violated the federal securities laws;

(b)   whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)   whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period (unique to the Exchange Act claim);

(f)     whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein;

(g)     whether the Offering Documents were false and misleading; and

(h)     whether the members of the Exchange Act Class and the Securities Act Subclass have sustained damages and, if so, what is the proper measure of damages.

212.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class and the Securities Act Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class and the Securities Act Subclass to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

213.   Exchange Act Class Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period

214.   Based upon the foregoing, Plaintiffs and the members of the Exchange Act Class are entitled to a presumption of reliance upon the integrity of the market.

215.    Alternatively, Plaintiffs and the members of the Exchange Act Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**<u>COUNT I</u>**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against USAT and the Officer Defendants**

216.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

217.    This Count is asserted against the Company and the Officer Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

218.    During the Class Period, the Company and the Officer Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219.    The Company and the Officer Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud;

made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

220.   The Company and the Officer Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

221.   The Officer Defendants, who were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity

of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

222.   As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Officer Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Officer Defendants' false and misleading statements.

223.   Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Officer Defendants' misleading statements and by the material adverse information which the Company and the Officer Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

224.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

225.   By reason of the foregoing, the Company and the Officer Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of The Exchange Act
### Against the Officer Defendants

226.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

227.   During the Class Period, the Officer Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

228.   As officers and/or directors of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct

promptly any public statements issued by the Company which had become materially false or misleading.

229.   Because of their positions of control and authority as senior officers, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Officer Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Officer Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

230.   Each of the Officer Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Officer Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Officer Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

231.   By reason of the above conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**COUNT III**
**Violation of Section 11 of the Securities Act Against All Defendants**

232.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that his Count III disclaims any allegations of fraudulent intent. Section 11 is a strict liability statute, subject only to affirmative defenses.

233.   This Count is asserted against all Defendants on behalf of all persons who purchased shares of the Company's common stock pursuant to the Company's SPO, in which shares registered under the Registration Statement were sold, and is based upon Section 11 of the Securities Act. 15 U.S.C. §77k.

234.   The Registration Statement was inaccurate and misleading, as described in detail above.

235.   The Company is the issuer of the securities and as such is strictly liable for the material misstatements and omissions contained in the Registration Statement.

236.   The Individual Defendants each signed the Registration Statement or authorized the signing of the Registration Statement on their behalf, and are

therefore liable for the misrepresentations and omissions contained therein and the failure of the Registration Statement to be complete and accurate.

237.   The Underwriter Defendants each served as underwriters in connection with the SPO, which was conducted pursuant to the Registration Statement. As such, each is liable for the misrepresentations and omissions contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

238.   By reason of the conduct alleged, each of the Defendants violated Section 11 of the Securities Act.

239.   The UPR Retirement System and members of the Securities Act Subclass acquired USAT common stock pursuant to the Registration Statement used for the SPO, and, at the time of their purchases, were without knowledge of the wrongful conduct alleged herein. This claim has been brought within one year of the discovery of the untrue statements and omissions and within three years of the date of the offering.

240.   The UPR Retirement System and the Securities Act Subclass are entitled to damages under Section 11 as measured by the provisions of Section 11(e).

### COUNT IV
### Violation of Section 12(a)(2) of the Securities Act Against USAT, the Officer Defendants, and the Underwriter Defendants

241.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

242.   This Count IV disclaims any allegations of fraudulent intent. Section 11 is a strict liability statute, subject only to affirmative defenses.

243.   This Count is brought by the UPR Retirement System, on behalf of all persons who purchased shares of USAT common stock pursuant to the SPO, against USAT, the Officer Defendants and the Underwriter Defendants, and is based on Section 12(a)(2) of the Securities Act. 15 U.S.C. §77l.

244.   By means of the Offering Documents, USAT, the Officer Defendants, and the Underwriter Defendants promoted and sold USAT common stock in the SPO, and therefore is liable under Section 12(a)(2) for the misrepresentations and omissions contained in the Offering Documents.

245.   At the time of their purchases, the UPR Retirement System and the Securities Act Subclass did not know, nor in the exercise of due diligence could have known, of the material misstatements and omissions in the Offering Documents.

246.   The UPR Retirement System and other members of the Securities Act Subclass who purchased USAT stock pursuant to the Offering Documents sustained substantial damages as a direct and proximate result of violations of Section 12(a)(2).

247.   Accordingly, members of the Securities Act Subclass who hold common stock issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares, or to recover rescissory or other

damages to the maximum extent permitted by law, and hereby tender (to the extent tender is required) their shares. Securities Act Subclass members who have sold their common stock seek damages to the maximum extent permitted by law.

## COUNT V
**Violation of Section 15 of the Securities Act Against the Individual Defendants**

248.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

249.   This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act. 15 U.S.C. §77o.

250.   The Individual Defendants, by virtue of their positions as senior officers or directors of the Company, were, at the time of the wrongs alleged herein, controlling persons of USAT within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause USAT to engage in the acts described herein.

251.   The Individual Defendants' positions made them privy to the material facts concealed from Plaintiffs and the Securities Act Subclass.

252.   By virtue of the conduct alleged herein, the Individual Defendants are liable as control persons for the violations of Section 11 by the persons they controlled, as alleged in Count III.

253.   Each of the Individual Defendants is liable to the UPR Retirement System and the Securities Act Subclass for damages suffered as a result of the Securities Act violations of the persons they controlled.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Exchange Act Class and the Securities Act Subclass by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 20, 2019        Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Jacob A. Goldberg
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827

Phillip Kim (admitted *pro hac vice*)
275 Madison Avenue
40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827

*Lead Counsel*

**WOLF POPPER LLP**

By: /s/ Robert C. Finkel
Robert C. Finkel (admitted *pro hac vice*)
845 Third Avenue
New York, NY 10022
Tel: (212) 759-4600
Fax: (212) 486-2093

*Counsel for Securities Act Subclass*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 20th day of November 2019, I caused a true and correct copy of the foregoing **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**, to be served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/ *Jacob A. Goldberg*

# EXHIBIT 1

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against USA Technologies, Inc. ("USAT"), and their current and former officers, and others in connection with the purchase and sale of securities issued by USAT.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed a complaint against USAT and certain of their officers and directors and I authorize The Rosen Law Firm, PA to file a lead plaintiff motion on my behalf.

2.  I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.  I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.  The following is a list of all of the purchases and sales I have made in USAT securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

    See schedule A

5.  I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.  I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this Day _____11/19/2019_____.

Signature _____

*Peter Farsaci*

757D89BDEFAE410...

Name: Peter Farsaci

## SCHEDULE A

### PETER FARSACI

CLASS PERIOD TRANSACTIONS

| PURCHASES | | | SALES | | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 9/11/2017 | 100 | ($5.30) | 9/15/2017 | 10000 | $5.46 |
| 9/11/2017 | 185 | ($5.30) | 9/21/2017 | 10000 | $5.46 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 200 | ($5.30) | 10/20/2017 | 30 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 70 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 300 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.35 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.33 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 90 | $6.33 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 10 | $6.33 |
| 9/11/2017 | 5800 | ($5.35) | 10/20/2017 | 90 | $6.33 |
| 9/11/2017 | 200 | ($5.30) | 10/20/2017 | 80 | $6.33 |
| 9/11/2017 | 52 | ($5.30) | 10/20/2017 | 20 | $6.33 |
| 9/11/2017 | 200 | ($5.30) | 10/20/2017 | 100 | $6.33 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 100 | $6.33 |
| 9/11/2017 | 163 | ($5.30) | 10/20/2017 | 100 | $6.33 |
| 9/11/2017 | 200 | ($5.30) | 10/20/2017 | 100 | $6.33 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 100 | $6.30 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 110 | $6.30 |
| 9/11/2017 | 300 | ($5.30) | 10/20/2017 | 190 | $6.30 |
| 9/11/2017 | 100 | ($5.30) | 10/20/2017 | 100 | $6.30 |
| 9/20/2017 | 1900 | ($5.33) | 10/20/2017 | 400 | $6.30 |
| 9/20/2017 | 1700 | ($5.32) | 10/20/2017 | 100 | $6.30 |
| 9/20/2017 | 1900 | ($5.32) | 10/20/2017 | 100 | $6.30 |
| 9/20/2017 | 4500 | ($5.32) | 10/20/2017 | 300 | $6.30 |
| 10/19/2017 | 10000 | ($6.24) | 10/20/2017 | 400 | $6.30 |
| 10/23/2017 | 10000 | ($6.24) | 10/20/2017 | 400 | $6.30 |
| 11/2/2017 | 100 | ($6.23) | 10/20/2017 | 10 | $6.30 |
| 11/2/2017 | 198 | ($6.25) | 10/20/2017 | 70 | $6.30 |
| 11/2/2017 | 381 | ($6.25) | 10/20/2017 | 7 | $6.30 |
| 11/2/2017 | 80 | ($6.25) | 10/20/2017 | 300 | $6.30 |

| | | | | | |
|---|---|---|---|---|---|
| 11/2/2017 | 102 | ($6.25) | 10/20/2017 | 100 | $6.30 |
| 11/2/2017 | 183 | ($6.25) | 10/20/2017 | 66 | $6.30 |
| 11/2/2017 | 350 | ($6.25) | 10/20/2017 | 100 | $6.30 |
| 11/2/2017 | 336 | ($6.25) | 10/20/2017 | 100 | $6.30 |
| 11/2/2017 | 211 | ($6.25) | 10/20/2017 | 200 | $6.30 |
| 11/2/2017 | 111 | ($6.25) | 10/20/2017 | 5057 | $6.25 |
| 11/2/2017 | 69 | ($6.25) | 10/31/2017 | 10000 | $6.41 |
| 11/2/2017 | 239 | ($6.25) | 11/2/2017 | 10000 | $6.40 |
| 11/2/2017 | 121 | ($6.25) | 11/30/2017 | 10000 | $8.61 |
| 11/2/2017 | 174 | ($6.25) | 12/7/2017 | 10000 | $8.66 |
| 11/2/2017 | 283 | ($6.25) | 12/12/2017 | 10000 | $8.75 |
| 11/2/2017 | 173 | ($6.25) | 12/12/2017 | 10000 | $8.96 |
| 11/2/2017 | 98 | ($6.25) | 12/12/2017 | 100 | $8.88 |
| 11/2/2017 | 260 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 2 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 247 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 239 | ($6.25) | 12/12/2017 | 300 | $8.86 |
| 11/2/2017 | 54 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 36 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 100 | ($6.25) | 12/12/2017 | 200 | $8.86 |
| 11/2/2017 | 39 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 5299 | ($6.24) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 100 | ($6.23) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 62 | ($6.23) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 100 | ($6.23) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 100 | ($6.23) | 12/12/2017 | 200 | $8.86 |
| 11/2/2017 | 53 | ($6.25) | 12/12/2017 | 100 | $8.86 |
| 11/2/2017 | 100 | ($6.23) | 12/12/2017 | 100 | $8.86 |
| 11/29/2017 | 100 | ($8.38) | 12/12/2017 | 96 | $8.86 |
| 11/29/2017 | 400 | ($8.40) | 12/12/2017 | 100 | $8.86 |
| 11/29/2017 | 100 | ($8.40) | 12/12/2017 | 100 | $8.86 |
| 11/29/2017 | 100 | ($8.40) | 12/12/2017 | 100 | $8.86 |
| 11/29/2017 | 100 | ($8.40) | 12/12/2017 | 100 | $8.83 |
| 11/29/2017 | 100 | ($8.40) | 12/12/2017 | 7504 | $8.81 |
| 11/29/2017 | 100 | ($8.40) | 12/18/2017 | 10000 | $9.46 |
| 11/29/2017 | 100 | ($8.40) | 12/18/2017 | 10000 | $9.66 |
| 11/29/2017 | 100 | ($8.40) | 12/26/2017 | 10000 | $9.61 |
| 11/29/2017 | 20 | ($8.40) | 1/5/2018 | 10000 | $9.66 |
| 11/29/2017 | 100 | ($8.40) | 1/16/2018 | 10000 | $9.60 |
| 11/29/2017 | 100 | ($8.40) | 1/16/2018 | 10000 | $9.55 |
| 11/29/2017 | 100 | ($8.40) | 1/24/2018 | 100 | $8.65 |
| 11/29/2017 | 500 | ($8.43) | 1/24/2018 | 400 | $8.65 |
| 11/29/2017 | 400 | ($8.43) | 1/24/2018 | 400 | $8.65 |
| 11/29/2017 | 533 | ($8.43) | 1/24/2018 | 209 | $8.65 |
| 11/29/2017 | 100 | ($8.43) | 1/24/2018 | 100 | $8.65 |

| | | | | | |
|---|---|---|---|---|---|
| 11/29/2017 | 400 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 300 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 400 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 100 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 100 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 300 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 300 | ($8.43) | 1/24/2018 | 100 | $8.60 |
| 11/29/2017 | 3767 | ($8.45) | 1/24/2018 | 400 | $8.60 |
| 11/29/2017 | 1280 | ($8.44) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 1 | $8.65 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 200 | ($8.45) | 1/24/2018 | 700 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 200 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 99 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.45) | 1/24/2018 | 300 | $8.60 |
| 12/1/2017 | 2000 | ($8.48) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 400 | $8.60 |
| 12/1/2017 | 200 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 17 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.60 |
| 12/1/2017 | 500 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 9 | $8.65 |
| 12/1/2017 | 400 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 83 | ($8.50) | 1/24/2018 | 100 | $8.66 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 599 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.78 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 300 | $8.65 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 200 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 200 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |

| Date | Qty | Price | Date | Qty | Price |
|---|---|---|---|---|---|
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 400 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.65 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 100 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 800 | $8.66 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 800 | $8.75 |
| 12/1/2017 | 100 | ($8.50) | 1/24/2018 | 900 | $8.65 |
| 12/1/2017 | 2900 | ($8.55) | 1/24/2018 | 20500 | $8.66 |
| 12/26/2017 | 10000 | ($9.44) | 1/24/2018 | 100 | $8.65 |
| 1/4/2018 | 10000 | ($9.44) | 1/24/2018 | 100 | $8.65 |
| 1/8/2018 | 10000 | ($9.45) | 1/24/2018 | 100 | $8.65 |
| 1/9/2018 | 10000 | ($9.24) | 1/24/2018 | 191 | $8.65 |
| 1/10/2018 | 10000 | ($9.09) | 1/24/2018 | 300 | $8.65 |
| 1/16/2018 | 10000 | ($9.34) | 1/24/2018 | 100 | $8.65 |
| 1/18/2018 | 10000 | ($9.20) | 1/24/2018 | 100 | $8.65 |
| 1/23/2018 | 10000 | ($9.04) | 1/24/2018 | 100 | $8.75 |
| 1/25/2018 | 10000 | ($8.74) | 1/24/2018 | 100 | $8.78 |
| 3/16/2018 | 10000 | ($9.44) | 1/24/2018 | 1 | $8.75 |
| 3/19/2018 | 10000 | ($9.45) | 1/24/2018 | 100 | $8.78 |
| 3/20/2018 | 1000 | ($9.45) | 1/24/2018 | 100 | $8.75 |
| 3/22/2018 | 10000 | ($9.45) | 1/24/2018 | 1 | $8.70 |
| 3/23/2018 | 10000 | ($9.09) | 1/24/2018 | 100 | $8.75 |
| 3/28/2018 | 10000 | ($8.99) | 1/24/2018 | 100 | $8.70 |
| 4/2/2018 | 10000 | ($8.84) | 1/24/2018 | 100 | $8.75 |
| 4/19/2018 | 800 | ($9.20) | 1/24/2018 | 100 | $8.70 |
| 4/19/2018 | 2000 | ($9.20) | 1/24/2018 | 200 | $8.75 |
| 4/19/2018 | 2300 | ($9.19) | 1/24/2018 | 400 | $8.70 |
| 4/19/2018 | 4900 | ($9.18) | 1/24/2018 | 500 | $8.75 |
| 4/20/2018 | 10000 | ($9.05) | 1/24/2018 | 1000 | $8.66 |
| 4/24/2018 | 10000 | ($8.60) | 1/24/2018 | 400 | $8.75 |
| 5/14/2018 | 10000 | ($11.89) | 1/24/2018 | 1000 | $8.66 |
| 6/22/2018 | 10000 | ($13.39) | 1/24/2018 | 100 | $8.75 |
| 7/24/2018 | 9700 | ($14.95) | 1/24/2018 | 100 | $8.65 |
| 7/24/2018 | 300 | ($14.90) | 1/24/2018 | 100 | $8.75 |
| 7/24/2018 | 2387 | ($14.80) | 1/24/2018 | 100 | $8.65 |
| 7/24/2018 | 4500 | ($14.75) | 1/24/2018 | 100 | $8.75 |
| 7/24/2018 | 2900 | ($14.70) | 1/24/2018 | 100 | $8.65 |
| 7/24/2018 | 213 | ($14.65) | 1/24/2018 | 12790 | $8.56 |
| 9/5/2018 | 10000 | ($15.84) | 2/5/2018 | 150 | $7.71 |
| 9/25/2018 | 1000 | ($15.52) | 2/5/2018 | 30 | $7.80 |
| | | | 2/5/2018 | 200 | $7.70 |
| | | | 2/5/2018 | 100 | $7.80 |
| | | | 2/5/2018 | 200 | $7.71 |
| | | | 2/5/2018 | 200 | $7.80 |
| | | | 2/5/2018 | 7900 | $7.71 |
| | | | 2/5/2018 | 100 | $7.80 |

| Date | Quantity | Price |
|---|---|---|
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 300 | $7.80 |
| 2/5/2018 | 400 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 200 | $7.80 |
| 2/5/2018 | 200 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 200 | $7.80 |
| 2/5/2018 | 200 | $7.80 |
| 2/5/2018 | 400 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 200 | $7.90 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 100 | $7.90 |
| 2/5/2018 | 300 | $7.90 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 2915 | $7.76 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 100 | $7.90 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 100 | $7.90 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 200 | $7.85 |
| 2/5/2018 | 200 | $7.75 |
| 2/5/2018 | 200 | $7.85 |
| 2/5/2018 | 250 | $7.75 |
| 2/5/2018 | 200 | $7.85 |
| 2/5/2018 | 100 | $7.75 |
| 2/5/2018 | 100 | $7.80 |
| 2/5/2018 | 100 | $7.70 |
| 2/5/2018 | 1715 | $7.80 |
| 2/5/2018 | 400 | $7.70 |
| 2/5/2018 | 740 | $7.80 |
| 2/8/2018 | 10000 | $9.61 |
| 2/8/2018 | 10000 | $9.56 |
| 3/16/2018 | 10000 | $9.60 |
| 3/20/2018 | 10000 | $9.66 |
| 3/21/2018 | 10000 | $9.70 |
| 4/18/2018 | 10000 | $9.31 |
| 5/4/2018 | 10000 | $9.21 |
| 5/7/2018 | 1000 | $9.66 |

| | | |
|---|---|---|
| 5/7/2018 | 9000 | $9.66 |
| 5/8/2018 | 10000 | $9.96 |
| 6/28/2018 | 10000 | $13.76 |
| 9/21/2018 | 10000 | $9.86 |
| 9/21/2018 | 10000 | $9.41 |
| 9/21/2018 | 20000 | $9.76 |
| 9/21/2018 | 20000 | $9.70 |
| 9/21/2018 | 10000 | $9.51 |
| 9/21/2018 | 10000 | $9.41 |
| 9/25/2018 | 15000 | $8.26 |
| 9/25/2018 | 1000 | $8.36 |
| 9/26/2018 | 15000 | $8.16 |
| 9/26/2018 | 10000 | $8.16 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of November 2019, I caused a true and correct copy of the foregoing **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS,** to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

Jacob A. Goldberg

**FILED**

NOV 2 0 2019

KATE BARKMAN, Clerk
By _____ Dep. Clerk